**UNITED STATES of America,
Plaintiff–Appellant,**

**v.**

**Wanis KOYOMEJIAN; Raffi Kouyoumjian; Simon Kouyoumjian; Agop Kouyoumjian; Ohanes Khawaloujian; Salim Chalhoub; Rita Sorfazian; Dalida Avakian; Avedis Khawaloujian; Jimmy Contreras; Raul Vivas; Hamayak Atayan, Defendants–Appellees.**

No. 90–50218.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 30, 1992.

Decided July 1, 1992.

Concurrence July 2, 1992.

---

Steven D. Clymer and Richard G. Rathmann, Asst. U.S. Attys., Los Angeles, Cal., for plaintiff-appellant.

Steve Cochran, Katten, Muchin, Zavis & Weitzman, Los Angeles, Cal., for defendants-appellees Wanis Koyomejian and Simon Kouyoumjian.

Before: WALLACE, Chief Judge, and BROWNING, SCHROEDER, POOLE, CANBY, NORRIS, KOZINSKI, THOMPSON, LEAVY, TROTT, and NELSON, Circuit Judges.

TROTT, Circuit Judge:

This case presents the question whether federal law prohibits the use of silent video surveillance as part of a domestic criminal investigation, and if not, what standards govern such surveillance. On an interlocutory appeal brought under 18 U.S.C. § 3731 (1988), a divided panel of this court held domestic silent video surveillance was permitted, but only if processed and approved pursuant to the technical procedures specified in 18 U.S.C. §§ 2510–2521 (1988 & Supp. II 1990) ("Title I"). *United States v. Koyomejian,* 946 F.2d 1450 (9th Cir.1991), *amended on other grounds* (9th Cir. Jan. 16, 1992). We granted a rehearing en banc, 957 F.2d 636 (9th Cir.1992), and now hold that silent domestic video surveillance is neither prohibited nor regulated by Title I.

## I FACTS

In January of 1988, the government began investigating the conduct of the defendants in this case, Wanis Koyomejian and eighteen other persons, all associated with Ropex Corporation, a gold and jewelry business located in Los Angeles, California. The government suspected Ropex was being used to launder cash receipts from narcotics trafficking. According to the indictments filed in this case, Koyomejian and his employees would collect the cash received from narcotics sales, deposit it in bank accounts in Los Angeles, and wire

transfer it to a gold refining company in Florida, supposedly to buy gold for Ropex. From Florida, the money would flow through a series of complex sham transactions, and eventually would be funneled out of the country to companies owned by Colombian drug dealers. The indictments allege that over a two-year period, more than 312 million dollars was laundered by the defendants.

On September 9, 1988, the government filed in district court applications to install hidden microphones and silent closed circuit television cameras inside Ropex's offices. The application to install the hidden television cameras was brought under Rules 41(b) and 57 of the Federal Rules of Criminal Procedure, and the All Writs Act, 28 U.S.C. § 1651 (1988). The application to install the hidden microphones was brought under Title I. Both applications were supported by a single seventy-seven page affidavit from Bruce R. Stephens, a Special Agent of the Federal Bureau of Investigation.

The district court granted the government's applications, and on September 19, 1988, the government began both audio and silent video surveillance of Ropex's offices. The surveillance produced silent video tapes of nine of the defendants receiving, counting, and packaging large amounts of cash, which later was deposited into local banks. On February 22, 1989, the defendants were arrested and all surveillance ceased.

On March 7, 1989, the defendants were indicted for conspiracy to aid and abet the possession and distribution of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846 (1988), 18 U.S.C. § 2 (1988), and conspiracy to launder monetary instruments, in violation of 18 U.S.C. §§ 371, 1956 (1988), as well as substantive money laundering counts, in violation of 18 U.S.C. § 1956. Seven of the nineteen defendants pleaded guilty. The remaining twelve defendants, eleven of whom were the subject of a superseding indictment, are the appellants in this case.

Throughout March of 1990, the district court held hearings on various pretrial motions filed by the defendants, including a motion to suppress the fruits of the video surveillance. On March 27, 1990, the district court ruled that domestic silent video surveillance was prohibited by Title I, and granted the defendants' motion to suppress. The district court denied the government's motion for reconsideration, but stayed the trial pending the government's interlocutory appeal to this court.

## II  DISCUSSION

This case hinges on a proper interpretation of Title I and the Foreign Intelligence Surveillance Act, 50 U.S.C. §§ 1801–1811 (1988) (the "FISA"). Title I regulates the interception for domestic purposes of "wire, oral, or electronic communication[s]," 18 U.S.C. § 2511(1); its definition of those terms does not include silent video surveillance, *see* 18 U.S.C. § 2510. The FISA regulates the use for "foreign intelligence" purposes, 50 U.S.C. § 1804(a)(7)(B), of any form of "electronic surveillance," 50 U.S.C. § 1802, including silent video surveillance, *see* 50 U.S.C. § 1801(f)(4). The question is what effect, if any, these statutes have on silent video surveillance conducted for purely domestic purposes.

The defendants argue that domestic silent video surveillance is prohibited by Title I, or, alternatively, that it is regulated by Title I; the government claims such surveillance is neither prohibited nor regulated by the statute. The district court found domestic silent video surveillance was prohibited by Title I; the original panel found it was not prohibited, but regulated. We conclude (1) neither Title I nor the FISA prohibits domestic silent video surveillance; (2) Title I does not regulate such surveillance; (3) the Fourth Amendment does regulate such surveillance.

## A  NEITHER TITLE I NOR THE FISA PROHIBITS DOMESTIC SILENT VIDEO SURVEILLANCE

■ Title I does not address silent video surveillance. By its terms, the statute governs the interception of "wire, oral, or electronic communications...." 18 U.S.C.

§ 2511. The statute defines a "wire communication" as "any *aural* transfer made ... through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception...." 18 U.S.C. § 2510(1) (emphasis added). An "oral communication" is defined as "any *oral* communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation...." 18 U.S.C. § 2510(2) (emphasis added). An "electronic communication" is "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature *transmitted ... by a wire*...." 18 U.S.C. § 2510(12) (emphasis added). Finally, "intercept" means "the aural or other acquisition of the *contents of any wire, electronic, or oral communication* through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4) (emphasis added).

By their plain meaning, these definitions do not apply to silent video surveillance. As the Supreme Court stated, discussing 18 U.S.C. §§ 2510–2520 (1968) (amended 1970, 1986, 1988) ("Title III"), the predecessor of Title I,[1] the statute "is concerned only with orders 'authorizing or approving the interception of a wire or oral communication....'" *United States v. New York Tel. Co.*, 434 U.S. 159, 166, 98 S.Ct. 364, 369, 54 L.Ed.2d 376 (1977) (quoting 18 U.S.C. § 2518(1)) (emphasis removed) (omission in *New York Tel. Co.*). The Court held pen registers[2] are not subject to the statute because "[t]hese devices do not hear sound.... [They] do not accomplish the 'aural acquisition' of anything[, and they] present the information in a form to be interpreted by sight rather than by hearing." *Id.* at 167, 98 S.Ct. at 369–70. This analysis applies equally to silent video surveillance. *See United States v. Biasucci*,

786 F.2d 504, 508 (2d Cir.) (quoting *New York Tel. Co.*, 434 U.S. at 166, 98 S.Ct. at 369), *cert. denied*, 479 U.S. 827, 107 S.Ct. 104, 107, 93 L.Ed.2d 54, 56 (1986).

The legislative history of Title I also indicates the statute does not regulate silent video surveillance. "The Senate committee report, after repeating the statutory definition of 'aural acquisition,' remarks: 'Other forms of surveillance are not within the proposed legislation.'" *United States v. Torres*, 751 F.2d 875, 880 (7th Cir.1984) (quoting S.Rep. No. 1097, 90th Cong., 2d Sess. 90 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2178), *cert. denied*, 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985).

The 1986 Senate Report on Title I makes clear that Congress did not intend to regulate domestic silent video surveillance. The Report states:

Although this bill does not address questions of the application of title III standards to video surveillance and only deals with the interception of closed circuit television communications to a limited extent, closed circuit television communications do provide another example of the importance of, and the interrelationship between, the definitions contained in this legislation. If a person or entity transmits a closed circuit television picture of a meeting using wires, microwaves or another method of transmission, the transmission itself would be an electronic communication. Interception of the picture at any point without either consent or a court order would be a violation of the statute. *By contrast, if law enforcement officials were to install their own cameras and create their own closed circuit television picture of a meeting, the capturing of the video images would not be an intercep-*

---

1. Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 82 Stat. 212, was amended and retitled by Title I of the Electronic Communications Privacy Act of 1986, Pub.L. No. 99–508, 100 Stat. 1851. Throughout this opinion, we refer to 18 U.S.C. §§ 2510–2521 as "Title I."

2. "A pen register is a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released. It does not overhear oral communications and does not indicate whether calls are actually completed." *New York Tel. Co.*, 434 U.S. at 161 n. 1, 98 S.Ct. at 366 n. 1.

*tion under the statute because there would be no interception of the contents of an electronic communication.* Intercepting the audio portion of the meeting would be an interception of an oral communication, and the statute would apply to that portion.

S.Rep. No. 541, 99th Cong., 2d Sess. 16–17, *reprinted in* 1986 U.S.C.C.A.N. 3555, 3570–71 (emphasis added).

■ In contrast, it is clear that FISA does regulate silent video surveillance. FISA regulates "electronic surveillance," 50 U.S.C. § 1802(a), which it defines quite broadly to include:

> the installation or use of an electronic, mechanical, or other surveillance device in the United States for monitoring to acquire information, other than from a wire or radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes.

50 U.S.C. § 1801(f)(4). This definition clearly includes the use of closed circuit television cameras and other video surveillance equipment. *See Torres,* 751 F.2d at 881.

However, it is equally clear that the FISA applies only to surveillance designed to gather information relevant to foreign intelligence. *See* 50 U.S.C. § 1802(a)(1) ("the President . . . may authorize electronic surveillance . . . under this chapter to acquire foreign intelligence information"); *id.* § 1802(a)(1)(A)(i)–(ii); *id.* § 1804(a)(7)(B) (FISA authorizes surveillance only when "the purpose of the surveillance is to obtain foreign intelligence information"). The FISA does not regulate surveillance conducted for purely domestic purposes. *See Torres,* 751 F.2d at 881.

Together, the FISA and Title I describe an incomplete 2 × 2 matrix regulating aural and visual electronic surveillance conducted for foreign and domestic purposes.[3] The FISA regulates both aural and visual electronic surveillance conducted for foreign intelligence purposes, and Title I regu-

lates aural electronic surveillance conducted for domestic purposes. The fourth and final element of the matrix, visual electronic surveillance conducted for domestic purposes, is not addressed either by Title I or the FISA:

|        | FOREIGN          | DOMESTIC        |
|--------|------------------|-----------------|
| AURAL  | FISA REGULATES   | TITLE I REGULATES |
| VISUAL | FISA REGULATES   | NOT ADDRESSED   |

Ordinarily, of course, when regulatory statutes do not address an activity, the activity is not regulated, and certainly not prohibited, by those statutes. Hence, because domestic silent video surveillance is not addressed by Title I or the FISA, it would appear that it may be conducted without regard to those statutes. However, the defendants argue, and the district court found, that Title I prohibits all electronic surveillance which it does not regulate. The defendants rely on 18 U.S.C. § 2511(2)(f), a provision of the FISA that amended Title III, which provides in pertinent part: "[P]rocedures in [Title I and the FISA] shall be the exclusive means by which electronic surveillance, as defined in [the FISA], and the interception of domestic wire and oral communications may be conducted." The defendants argue this provision outlaws any form of electronic surveillance not expressly authorized (and regulated) by Title I or the FISA because those statutes are the "exclusive means" by which electronic surveillance may be conducted.

We reject the defendants' argument. Like the other circuits that have ruled on this issue, and the original panel of this court, we conclude that neither § 2511(2)(f), nor anything else in the text or legislative history of Title I or the FISA, prohibits silent video surveillance for domestic purposes.

---

**3.** This case does not involve, and so the matrix does not address, the interception of silent video images transmitted by wire or other electronic means.

All ... section [2511(2)(f) ] means to us ... is that the [FISA] is intended to be exclusive in its domain and Title [I] in its [domain]. The powers that the [FISA] gives the government to keep tabs on agents of foreign countries are not to be used for purely domestic investigations, and conversely the limitations that Title [I] places on wiretapping and bugging are not to be used to hobble the government's activities against foreign agents. To read the [FISA] as the defendants would have us do would give a statute designed to regularize the government's broad powers to deal with the special menace posed by agents of foreign powers the side effect of curtailing the government's powers in domestic law enforcement. This is not what Congress intended in making what the Senate report on the bill that became the [FISA] described as a "technical and conforming" amendment to Title [I]....

The fact is that Congress has never addressed the issue of judicial authorization of television surveillance in [domestic] federal criminal investigations.

*Torres,* 751 F.2d at 881–82; *see Biasucci,* 786 F.2d at 508 n. 4 (quoting *Torres,* 751 F.2d at 881).

## B TITLE I DOES NOT REGULATE DOMESTIC SILENT VIDEO SURVEILLANCE

■ In the alternative to their argument that Title I prohibits domestic silent video surveillance, the defendants claim Title I regulates such surveillance. They argue that interpreting Title I to ignore domestic silent video surveillance "eviscerates" congressional intent because it produces an obvious asymmetry: a regulatory scheme which governs foreign audio surveillance, foreign silent video surveillance, domestic audio surveillance, but *not* domestic silent video surveillance. The defendants also claim § 2511(2)(f) indicates Congress intended to subject domestic silent video surveillance to the same restrictions as domestic audio surveillance.

Again, we reject the defendants' arguments. As the dissent to the original panel

opinion noted, it is "impossible for silent television surveillance to intercept a 'wire, oral, or electronic communication.'" *Koyomejian,* 946 F.2d at 1461 n. 1 (Hall, J., dissenting). Unlike the panel majority, we do not believe Congress must have "simply assumed [in 1986] that video surveillance was already regulated by Title III...." *Id.* at 1457. On the record before us, we do not think it "simply ... [unbelievable] that Congress intended the anomalous result of subjecting less intrusive forms of surveillance than video to exacting procedural safeguards while leaving video surveillance itself unregulated." *Id.* This statement discounts the strict controls on video surveillance imposed by the Fourth Amendment and Federal Rule of Criminal Procedure 41. *See* Part II.C, *infra.*

Further, although Congress' regulatory scheme is asymmetrical, Congress is not required to think like a lawyer, and we are not empowered to impose on clear statutory language our own notions of symmetry. *See Koyomejian,* 946 F.2d at 1461 (Hall, J., dissenting); *Torres,* 751 F.2d at 885–86. Nothing in Title I or the FISA regulates or even discusses domestic silent video surveillance. We cannot rewrite those statutes.

## C THE FOURTH AMENDMENT REGULATES DOMESTIC SILENT VIDEO SURVEILLANCE

■ Although domestic silent video surveillance is not regulated by statute, it is of course subject to the Fourth Amendment. *See Torres,* 751 F.2d at 882. Although the district court did not pass on the Fourth Amendment issue in this case, we address it nonetheless because it is a purely legal issue, and in the interest of judicial economy. *See Badea v. Cox,* 931 F.2d 573, 575 n. 2 (9th Cir.1991) (recognizing that this court has the "power" to decide, and that "[t]here may well be valid reasons for" deciding, "*ab initio* issues that the district court has not had an opportunity to consider[, the parties have not briefed] and that present questions of first impression in our circuit"). We proceed to describe the Constitutional requirements

for silent video surveillance conducted for domestic purposes.

■ As a preliminary matter, we conclude that Rule 41(b) of the Federal Rules of Criminal Procedure authorizes a district court to issue warrants for silent video surveillance. *See United States v. Mesa–Rincon*, 911 F.2d 1433, 1436 (10th Cir.1990) ("Rule 41 is sufficiently flexible to include within its scope electronic intrusions authorized upon a finding of probable cause.'" (quoting *New York Tel. Co.*, 434 U.S. at 169, 98 S.Ct. at 371)); *Biasucci*, 786 F.2d at 509; *Torres*, 751 F.2d at 877–78.

■ Second, following the other circuits which have ruled on this issue, we "look to Title [I] for guidance in implementing the fourth amendment in an area that Title [I] does not specifically cover." *Mesa–Rincon*, 911 F.2d at 1438. While we do not adopt all of the special, technical requirements of Title I, *see, e.g.,* 18 U.S.C. § 2516, we do adopt the following four requirements, in addition to the ordinary requirement of a finding of probable cause:

(1) the judge issuing the warrant must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(3)(c); (2) the warrant must contain "a particular description of the type of [activity] sought to be [videotaped], and a statement of the particular offense to which it relates," *id.* § 2518(4)(c); (3) the warrant must not allow the period of [surveillance] to be "longer than is necessary to achieve the objective of the authorization, [ ]or in any event longer than thirty days" (though extensions are possible), *id.* § 2518(5); and (4) the warrant must require that the [surveillance] "be conducted in such a way as to minimize the [videotaping] of [activity] not otherwise subject to [surveillance] ...," *id.*

*United States v. Cuevas-Sanchez,* 821 F.2d 248, 252 (5th Cir.1987); *see Torres,* 751 F.2d at 885; *Biasucci,* 786 F.2d at 510;

*Mesa–Rincon,* 911 F.2d at 1437. We are satisfied that these requirements comport with the demands of the Constitution, and guard against unreasonable video searches and seizures.

## III CONCLUSION

Neither Title I nor the FISA regulates or prohibits silent video surveillance undertaken for domestic purposes. The Fourth Amendment does govern such surveillance, however, and requires adherence to the non-technical provisions of Title I listed above. The order suppressing the video evidence is vacated, and the case is remanded to the district court to measure the video surveillance against the Constitutional standards announced in this opinion, unless the district court determines that any Fourth Amendment issue has been waived.

VACATED AND REMANDED.

KOZINSKI, Circuit Judge, concurring in the judgment.[*]

I agree with the result reached by the majority, but I part company with my colleagues on two important points: First, the majority relies on legislative history in a case where clear statutory language resolves the question before us in a sensible fashion; second, the majority adopts wholesale a comprehensive code of procedure governing the issuance of warrants for silent video surveillance.

### I

The majority examines the text of Title I and concludes that "[b]y their plain meaning, these [statutory] definitions do not apply to silent video surveillance." Maj.op. at 539. My colleagues nevertheless proceed to consider the state of congressional intent by conducting a lengthy survey of the statute's legislative history. *Id.* at 539–40. Similarly, the majority rejects the notion that "§ 2511(2)(f), [or] anything else in the text ... of Title I or the FISA, prohibits silent video surveillance for domestic pur-

---

[*] In accordance with procedures outlined in General Order 4.5(a), the majority opinion in this case was filed before this separate opinion was

completed. A notation to this effect in the majority opinion was omitted in error.

poses," *id.* at 540, but feels constrained to add the qualifier "or legislative history."

But if the text is clear, as the majority correctly concludes, what possible justification is there for consulting legislative history? Because the language that Congress passed into law and the President signed does not cover silent video surveillance, our inquiry must end, as it began, with the statute itself. Although the Supreme Court has occasionally wavered from this age-old rule of statutory construction, *see INS v. Cardoza–Fonseca,* 480 U.S. 421, 452, 107 S.Ct. 1207, 1223, 94 L.Ed.2d 434 (1987) (Scalia, J., concurring), the Court recently put to rest any doubt concerning it: "[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Connecticut Nat'l Bank v. Germain,* — U.S. ——, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) (internal citations and quotation omitted); *see also Patterson v. Shumate,* — U.S. ——, — n. 4, 112 S.Ct. 2242, 2248 n. 4, 119 L.Ed.2d 519 (1992) (courts of appeals relying on "isolated excerpts" of legislative history in cases involving clear statutory language "have misconceived the appropriate analytical task").

Reflexive resort to legislative history, even when the statutory language is clear, raises the strong (but wrong) implication that such collateral sources are indispensable to the interpretation of even the clearest statutes. It suggests that we may refuse to follow clear statutory language, even when it is consistent with the structure of the statute and does not lead to a "positive repugnancy," *Germain,* 112 S.Ct. at 1149, because of something found in a committee report, a floor statement or some other piece of legislative jetsam. The danger of this approach is nowhere better illustrated than right here: The original panel majority dredged up scraps of legislative history to support the conclusion that

silent video surveillance is covered by Title I. 946 F.2d 1450, 1454–58 (9th Cir.1991). This is a result so dubious not a single member of the en banc panel—not even Judge Norris, who cast the deciding vote for the original panel opinion—is able to endorse it today. What more can one possibly say?

Legislative history, if it is relevant at all, must be consulted only where the statutory language is unclear or leads to an absurd result. It should be a tool for solving problems, not creating them. Indiscriminate use of legislative history, like the promiscuous use of antibiotics, only makes the disease of poor legislative draftsmanship worse and the cure more difficult to come by.

## II

More troubling still is the majority's matter-of-fact—almost casual—promulgation of a code of procedure governing the issuance of warrants for silent video surveillance. Maj. op. at 541–42. The majority selects a number of the requirements for electronic surveillance in Title I and holds that warrants for video surveillance may not be issued unless those requirements are met, "in addition to the ordinary requirement of a finding of probable cause." *Id.* at 542. While my colleagues declare themselves "satisfied that these requirements comport with the demands of the Constitution, and guard against unreasonable video searches and seizures," *id.* at 542, they offer no analytical support for their conclusion. It is true that four other circuits have hurled themselves over this precipice, but we have a responsibility to do our own analysis and reach our own conclusions. The majority does neither.

## A

1. My most fundamental objection is that the majority creates a code of procedure—mature and complete, like Athena sprung from the head of Zeus—to govern the issuance of warrants for silent video surveillance. This is not a situation where we are merely aggregating a series of re-

quirements distilled through a long line of cases considering various aspects of the problem. Instead, the court takes the highly unusual step of adopting, on the occasion of its first confrontation with a video surveillance warrant, a series of separate and largely unrelated rules, the sum of which, the court assures us, will "guard against unreasonable video searches and seizures." Maj.op. at 542. I am aware that the dividing line between adjudication and legislation is not as crisp in practice as it appears in theory. But by anybody's definition, what the court does today falls in the realm of legislation. Any doubt on this score is surely removed by the court's explicit and conscious adoption of its requirements from Title I. If this is adjudication, I am a fish.

We should pause and question our competence to step so far afield of our normal adjudicatory function, and the wisdom of our doing so. "Courts are as a general matter in the business of applying settled principles and precedents of law to the disputes that come to bar." *James B. Beam Distilling Co. v. Georgia*, — U.S. —, 111 S.Ct. 2439, 2442, 115 L.Ed.2d 481 (1991). They are at their best developing standards slowly, through a process of adjudicatory accretion. *See* Ruggero Aldisert, *Logic for Lawyers* 8 (1989). A gradual approach is consistent with the nature of our authority—to resolve cases and controversies—and the fact that our horizon is, perforce, limited by the record before us and the arguments of the parties. Our process is piecemeal and backward-looking, not sweeping and forward-looking like that of a legislature. To be sure, in resolving

disputes we must keep in mind the implications our decisions will have on future events, and many an opinion has been written more broadly than the facts of the case called for. But I question our institutional competence to adopt such a detailed procedural code—a swatch cut from legislative broadcloth—to govern all future video warrants in this circuit.

Even if a federal court could, under unusual circumstances, properly adopt this type of judicial legislation, this is hardly the case for it. Because the warrant was issued in full compliance with all of the majority's newly minted rules, the rules are pure dicta, and dicta of the worst sort: Neither party before us suggested that the Fourth Amendment requires these rules. Defendants do not even mention the Fourth Amendment in their briefs, which focus entirely on whether Title I prohibits or regulates silent video surveillance. Not only, then, does the majority legislate without the normal trappings of the legislative process, it does so without the debate, argument and clash of competing interests that is the hallmark of the judicial process.

My colleagues do rely on cases from four other circuits, believing perhaps that those courts had better advice. But in *not one* of those cases did the adoption of these rules make a whit of difference to the outcome.[1] In no case anywhere, then, has the party that will bear the principal onus of these requirements—the United States government—had any cause to challenge them or to question the authority of the courts of appeals to adopt them.[2] The rules of procedure that now stand as the

---

**1.** *See United States v. Mesa–Rincon*, 911 F.2d 1433, 1446 (10th Cir.1990) ("We also hold that the district court's order authorizing video surveillance in this case complied with all the requirements we now impose on video surveillance."); *United States v. Cuevas–Sanchez*, 821 F.2d 248, 252 (5th Cir.1987) ("The evidence shows that the government followed all the requirements set out in *Biasucci*."); *United States v. Biasucci*, 786 F.2d 504, 510 (2d Cir.) ("A review of the government's application ... demonstrates that all of the constitutional requirements set out above were met."), *cert. denied*, 479 U.S. 827, 107 S.Ct. 104, 107, 93 L.Ed.2d 54, 56 (1986); *United States v. Torres*, 751 F.2d 875,

884 (7th Cir.1984) ("the warrants complied with all four of the requirements of [Title I] that implement the constitutional requirement of particularity"), *cert. denied sub nom. Rodriguez v. United States*, 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985).

**2.** This has also made it more difficult for the government to seek review of these requirements in the Supreme Court. After all, the government was the prevailing party in each case, an awkward position from which to petition for certiorari, particularly where it made no difference at all in the case, and probably little practical difference for the future. *See* p. 551 *infra*.

law of five circuits, then, are a pure flight of judicial fancy, never once strained through the fine mesh of the adversary process.

2. I'm also troubled by the ease with which the majority defers to the political branches of government in applying the constraints of the Constitution. While the majority does not explicitly say so,[3] it appears satisfied that it is implementing constitutional standards because it is adopting rules very similar to those adopted by the legislature in an analogous context. This is a dangerous precedent. All public officials are sworn to uphold the Constitution, *see United States v. Redondo–Lemos*, 955 F.2d 1296, 1299 (9th Cir.1992), but it is the judiciary's special function to measure the choices made by the political branches of government against the constitutional yardstick. *See United States v. Nixon*, 418 U.S. 683, 704–05, 94 S.Ct. 3090, 3105–06, 41 L.Ed.2d 1039 (1974). It is not enough that Congress and the President honestly believe they are complying with the Constitution; the federal courts must perform an independent review to make sure they are right.[4]

As I explain below, there is serious doubt whether the Constitution requires all of the rules the majority plucks from Title I (or whether Congress really thought it did). There is also much doubt whether compliance with these requirements necessarily satisfies constitutional standards. *See* pp. 550–551 *infra*. It is one thing for judges to use legislatively promulgated rules as a

starting point in constitutional analysis; it's quite another to end the analysis there. The degree of constitutional deference my colleagues and the judges of the other circuits have willingly given to complex choices made by Congress does not comport with our responsibility as I understand it.

### B

I turn now to the heart of the matter, whether the Fourth Amendment supports the rules adopted by the majority. Not all of the majority's requirements are objectionable. The text of the Warrant Clause mandates two of them: that the warrant be based on probable cause and it contain a particular description of what the video camera will survey. The further requirement that the warrant limit the period of surveillance is also legitimate under the Supreme Court's decision in *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). *Berger*, decided before the enactment of what is now Title I, held that any warrant for electronic surveillance may be in effect for only a limited time. *Id.* at 59, 87 S.Ct. at 1883. While the 30–day maximum the majority adopts is more legislative than I would prefer, it is acceptable in light of *Berger*, which held that two months for such warrants was too long.

The other requirements the majority adopts are another matter altogether.

1. One of them, the "least intrusive means" requirement, clearly has no consti-

---

**3.** But the courts on which they rely do. *See Mesa–Rincon*, 911 F.2d at 1438 ("We simply look to [Title I] for guidance in implementing the fourth amendment in an area that [Title I] does not specifically cover."); *Cuevas–Sanchez*, 821 F.2d at 251 (deciding to "use [Title I] as a guide for the constitutional standard"); *Biasucci*, 786 F.2d at 510 ("we borrow the statutory standards [of Title I] as a measure of the government's constitutional obligation"); *Torres*, 751 F.2d at 885 (relying on Title I as guide for constitutional requirements because it was "careful legislative attempt to solve a very similar problem").

**4.** Deference is particularly inappropriate where Congress affirmatively decided, as the majority recognizes, to exclude video surveillance from the statutory scheme. Video surveillance obvi-

ously raises somewhat different issues from wiretapping and other types of electronic surveillance covered by Title I. Does it really follow that, had Congress considered the matter directly, it would have treated video surveillance exactly the same as those methods it did consider? I find it more plausible to infer that by choosing to exclude video surveillance from Title I Congress and the President were recognizing that it is different from wiretapping and should not be treated the same. While this point is debatable, I am baffled by my colleagues' assumption that the *only* inference to be drawn from congressional exclusion of video surveillance is that it must be treated pretty much like those types of surveillance that were included. What ever happened to the maxim *inclusio unius est exclusio alterius*?

tutional moorings. According to the majority, a warrant for video surveillance may not be issued unless the judge finds that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." Maj.op. at 542 (quotation omitted). Like the courts it follows, the majority derives this requirement from Title I, 18 U.S.C. § 2518(3)(c), presumably because it believes Congress adopted it in service of the Constitution. In fact, that's not so. The Senate Report accompanying Title I [5] carefully explained when a particular requirement was adopted to implement a constitutional command, usually citing applicable Supreme Court decisions.[6] In discussing the "least intrusive means" requirement, the Senate Report makes it clear that Congress was *not* following the Constitution, but adopting additional protections derived from other sources: "This requirement is patterned after traditional search warrant practice and present English procedure in the issuance of warrants to wiretap by the Home Secretary. Compare *Report of the Committee of [sic] Councillors Appointed to Inquire into the Interception of Communication,* par. 64 (1957); *Read v. Case,* 4 Conn. 166 (1822)." S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 2112, 2190.[7] When the Report later discusses the responsibilities of the authorizing judge, it again does not link the least intrusive means requirement to the Constitution. *Id.* at 2191. Not only, then, is the majority wrong in deferring to Congress; it is doubly wrong in deferring where there

is no indication Congress itself thought it was relying on the Constitution.

Deference aside, there is no "least intrusive means" requirement in the Fourth Amendment. It goes without saying that nothing in the language of the amendment prefers certain kinds of searches to others; there is no constitutional hierarchy that law enforcement officers must follow, using the least intrusive means before proceeding to those that are more intrusive. Such a requirement makes some sense and could well have been developed during two centuries of search and seizure caselaw. After all, even before electronic surveillance, there were more intrusive and less intrusive ways of doing things: Watching a suspect's house in the hope he will come out carrying the contraband is less intrusive than entering and searching the house. Following a suspect in his automobile until he stops and gets out is less intrusive than stopping him on the highway and making him get out to be searched. Yet I'm aware of no case where the fruits of a valid search were suppressed because the police might have gone about their business in a less intrusive way.

The law, indeed, is to the contrary. The Supreme Court has oft confronted and rejected the argument that the reasonableness of a search or seizure depends on the availability of less intrusive alternatives. The problem for the Court has been that "[t]he logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers." *United*

---

**5.** Yes, Virginia, there *are* legitimate uses for legislative history, such as to show it doesn't say what others say it says. While my colleagues again make no direct reference to legislative history to show that Congress sought to implement constitutional requirements, the courts on which they rely do. *See, e.g., Biasucci,* 786 F.2d at 510 (adopting same code as majority and citing Senate Report in noting "there is abundant evidence that [Congress] specifically intended to adopt ... constitutional guidelines" when enacting these particular requirements).

**6.** For example, the Senate Report cites to *Berger v. New York,* and *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), in support of the "constitutional command of par-

ticularization." S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 2112, 2190. In support of the requirement that the order "specify the identity, if known, of the individual whose communications are to be intercepted," *id.* at 2191, the Report cites *West v. Cabell,* 153 U.S. 78, 14 S.Ct. 752, 38 L.Ed. 643 (1894).

**7.** A careful reading shows that neither the English report nor the Connecticut case refers to the United States Constitution. The English report discusses English policy towards interception of communications and makes recommendations concerning its continued use. The Connecticut case addresses the common law right of a bail to enter the house of the principal.

*States v. Martinez–Fuerte,* 428 U.S. 543, 557 n. 12, 96 S.Ct. 3074, 3082 n. 12, 49 L.Ed.2d 1116 (1976). In *Cady v. Dombrowski,* 413 U.S. 433, 447, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973), Justice Rehnquist stated for the Court: "The fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." The Court has stated and restated this rule. *See, e.g., United States v. Sokolow,* 490 U.S. 1, 11, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989) ("The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques."); *Colorado v. Bertine,* 479 U.S. 367, 374, 107 S.Ct. 738, 742, 93 L.Ed.2d 739 (1987) ("reasonable police regulations ... satisfy the Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure."); *United States v. Montoya de Hernandez,* 473 U.S. 531, 542, 105 S.Ct. 3304, 3311, 87 L.Ed.2d 381 (1985) (availability of less intrusive means does not render search unreasonable); *Block v. Rutherford,* 468 U.S. 576, 591 n. 11, 104 S.Ct. 3227, 3235 n. 11, 82 L.Ed.2d 438 (1984) (reaffirming that "administrative officials are not obliged to adopt the least restrictive means to meet their legitimate objectives"); *Michigan v. Long,* 463 U.S. 1032, 1053 n. 16, 103 S.Ct. 3469, 3483 n. 16, 77 L.Ed.2d 1201 (1983) ("we have never required police to adopt alternative measures to avoid a legitimate *Terry* type intrusion"); *but see Klarfeld v. United States,* 944 F.2d 583, 586–87 (9th Cir.1991).

The only hint that the Supreme Court might have a preference for less intrusive means when it comes to electronic surveillance is found in *Berger,* 388 U.S. at 60, 87 S.Ct. at 1884, where the Court noted:

"[T]he statute's procedure ... has no requirement for notice as do conventional warrants, nor does it overcome this defect by requiring some showing of special facts. On the contrary, it permits unconsented entry without any showing of exigent circumstances." One could read this as holding that the Constitution prefers conventional methods of search over electronic ones.[8] However, two subsequent Supreme Court cases undermine the authority of the *Berger* passage. The first is *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), decided the very next Term. In a lengthy footnote reconciling *Berger* with its earlier opinion in *Osborn v. United States,* 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), the Court concluded that the government need not give notice where it would defeat the purposes of the search (as is always the case with surveillance). 389 U.S. at 355–56 n. 16, 88 S.Ct. at 514 n. 16. Because *Berger* required exigent circumstances as a condition of dispensing with notice, removing the notice requirement also removed the requirement of exigent circumstances—and hence the only support for a least intrusive means requirement.

If any doubt remained about whether the Supreme Court believed a least intrusive means requirement lurks within the interstices of the Fourth Amendment as applied to electronic surveillance, the Court dispelled it in *United States v. New York Telephone Co.,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977). Like our case, *New York Telephone* involved a method of electronic surveillance not covered by the wiretap statute—a pen register. The Court confronted and rejected the argument that the wiretap statute prohibits pen registers (much along the lines of our statutory analysis today) and held that Fed.R.Crim.P. 41 authorizes the issuance of such a war-

---

8. Another reading of the passage might be that, if the government uses electronic means of surveillance, it must show why notice would not be feasible, but some courts and commentators have rejected this reading. *See, e.g., Mesa–Rincon,* 911 F.2d at 1439; Comment, *Cameras in Teddy Bears: Electronic Visual Surveillance and the Fourth Amendment,* 58 U.Chi.L.Rev. 1045, 1058–59 (1991). As Justice Black noted in his *Berger* dissent, giving notice to the subject of the wiretap would defeat its purpose. 388 U.S. at 86, 87 S.Ct. at 1897 (Black, J., dissenting). If the exigent circumstances requirement mentioned in *Berger* is to mean anything at all then, it must be read as requiring, in lieu of notice, some showing that other methods of surveillance—ones that do not dispense with the notice requirement—are unavailable.

rant. *Id.* at 165–70, 98 S.Ct. at 368–71. In approving the warrant, the Court did not impose a least intrusive means requirement; instead, it relied on the normal requirements of Rule 41. It's true that no one urged the Court to impose such a requirement, but then no one is urging this requirement upon us either. I find it a bit presumptuous for us to reach out to adopt a constitutional code of criminal procedure (including a requirement of least intrusive means) when the Supreme Court in very similar circumstances seemed entirely satisfied to rest on the procedures already in place under Rule 41.

2. There are also problems with the majority's requirement that the warrant contain "a statement of the particular offense to which [the videotaped activity] relates." Maj.op. at 542. This prong of the majority's standard goes astray in two ways. First, there is no requirement that the warrant itself contain a description of the crime; the warrant must only "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV, *see also United States v. Weber*, 923 F.2d 1338, 1342 (9th Cir.1990); Fed.R.Crim.P. 41(c)(1) (warrant need only "nam[e] or describ[e] the person or place to be searched"). Indeed, a requirement in Rule 41 that the warrant itself state the probable cause behind its issuance was eliminated in 1972 as "unnecessary paper work" because "[a] person who wishes to challenge the validity of a search warrant has access to the affidavits upon which the warrant was issued." Fed.R.Crim.P. 41 advisory committee's note (1972 amendment).

Second, I am aware of no constitutional requirement that an applicant for a warrant specify, and the judge determine, the precise statute violated; all authority is to the contrary. *See* 1 W. Lafave, *Search and Seizure* § 3.1 at 545 & n. 25 (2d ed. 1987) ("It need not be certain precisely what crime was committed."). As the Supreme Court has stated, "the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit be-

fore him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).

The majority is once again led astray by piggy-backing on the efforts of Congress. The requirement that the officers specify the criminal violation serves a purpose in the context of the Title I, which authorizes wiretap warrants only for specific, listed crimes. 18 U.S.C. § 2516(1). The requirement makes no sense, however, in implementing the commands of the Warrant Clause. Aside from the fact that it's nowhere found in the Fourth Amendment or any caselaw, it just doesn't do much to protect any legitimate interest of those subject to surveillance.

3. The majority also adopts a minimization requirement: "[T]he warrant must require that the surveillance be conducted in such a way as to minimize the videotaping of activity not otherwise subject to surveillance." Maj.op. at 542 (quotation and brackets omitted). Yet again, nothing in the Warrant Clause requires that the warrant itself state that the officers will conduct the search in such a way as to minimize seeing or discovering things not the subject of the warrant. The warrant simply must "be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized." *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir.1986).

In addition, there's no requirement that the officers conduct the search in the most minimally intrusive manner, *see United States v. Schmidt*, 947 F.2d 362, 371–72 (9th Cir.1991); the officers executing the search must only stay within the bounds of the warrant. Of course, the purpose of the particularity requirement is to minimize officers' discretion to rummage through personal effects, *see Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971); *Weber*, 923 F.2d at 1342; but there is no minimization requirement separate and apart from the

particularity requirement.[9] *Cf. United States v. Hayes*, 794 F.2d 1348, 1358 (9th Cir.1986) (Pregerson, J., dissenting) (chiding majority for "fail[ing] to limit the warrants so as to minimize intrusions upon patient's privacy interests"), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987).

The minimization requirement is a pretty good idea and in particular cases the court might weigh the failure to minimize in determining whether the warrant was properly executed. I am concerned, however, about making minimization a constitutional prerequisite for issuance of a warrant, when nothing in the Warrant Clause or the caselaw implementing it imposes such a requirement.

Minimization, like least intrusive means, is a requirement that could easily apply to all searches, not merely electronic ones. If it is a constitutional prerequisite, why then doesn't it apply across the board to all search warrant applications? For example, if the police suspect that contraband is in a suspect's apartment, why is there no requirement that they look first in the kitchen, then in the living room, and last in the bedroom on the theory that they should search the most private part of the residence, if at all, only if the contraband is not found elsewhere? Good as the majority's requirement sounds, it is not part of our constitutional search and seizure law. I see no authority for imposing it as to video surveillance any more than as to any other kind of search.

4. Finally, nothing in the Constitution supports the majority's insistence that only a judge may issue a video surveillance warrant. Maj. op. at 542.[10] It is hornbook law that the Fourth Amendment requires only a neutral and detached official, who need not be a judge or even a lawyer. *See Shadwick v. City of Tampa*, 407 U.S. 345, 348–49, 92 S.Ct. 2119, 2121–22, 32 L.Ed.2d 783 (1972) (rejecting argument that only judge or lawyer could issue warrants); *Illinois v. Gates*, 462 U.S. at 235, 103 S.Ct. at 2331 ("search and arrest warrants long have been issued by persons who are neither lawyers nor judges"). Again, it may well be a very good idea that video surveillance warrants be issued only by judges, but the Constitution does not grant us authority to impose such a requirement.[11] Worse, if the majority means to preclude magistrate judges from acting on applications for video surveillance warrants, *see* note 10 *supra*, it establishes a positive repugnancy with Fed.R.Crim.P. 41(a) which, according to the Supreme Court in *New York Telephone*, applies to all warrants not covered by Title I.

5. Even if, as I believe I have demonstrated, the Constitution does not directly support several of the requirements my colleagues adopt, is there nevertheless some other wellspring of authority on which we may draw in issuing these standards? It has been suggested, for exam-

---

**9.** A party can argue after the fact that the searching officers exceeded the scope of the warrant, *see United States v. Coleman*, 805 F.2d 474, 483 (3d Cir.1986), but that's much different than requiring that the warrant recite the litany mandated by today's majority.

**10.** It is unclear from the majority opinion whether it uses the term "judge" to refer only to district and circuit judges, or it also means to include magistrate judges. The fairer reading appears to be that magistrate judges are not authorized to issue warrants for video surveillance: The majority, like the four other circuits on which it relies, culled its list of requirements from Title I, which in turn *does* require that a wiretapping warrant be issued by a district or circuit judge. *See* 18 U.S.C. § 2518(1) (warrant application may only be presented to "judge of competent jurisdiction"); *id.* § 2510(9) ("judge of competent jurisdiction" defined in relevant part as "a judge of a United States district court or a United States court of appeals"). Title I's legislative history once again discloses that this is a requirement Congress added, not in compliance with the Constitution, but as a policy matter. S.Rep. No. 1097, *supra* note 6, at 2179 ("Existing Federal search warrant practice permits U.S. Commissioners and city mayors to issue warrants (18 U.S.C. § 3041 (1964)). This practice is too permissive for the interception of wire or oral communications.").

**11.** To the extent Fed.R.Crim.P. 41(a) is not displaced by the court's opinion today, it does require that federal warrants be issued by a judicial officer. But Rule 41(a) is a legislative requirement that may be changed by Congress or the Supreme Court. The majority's requirement that a judge issue the warrant purports to be constitutional.

ple, that federal courts may adopt prophylactic rules in the development of "constitutional common law." These are rules that are not themselves required by the Constitution but nevertheless support constitutional values. *See, e.g.,* Monaghan, *The Supreme Court, 1974 Term, Foreword: Constitutional Common Law,* 89 Harv. L.Rev. 1 (1975). Arguably, *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (custodial warnings), and *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) (exclusionary rule), are examples of "constitutional common law."

Not everyone agrees that federal courts enjoy constitutional common law authority. *See, e.g.,* Schrock & Welsh, *Reconsidering the Constitutional Common Law,* 91 Harv.L.Rev. 1117, 1124 (1978) (development of constitutional common law "is neither constitutional nor common law but pragmatism without either precedent or principle— judicial realism radicalized and rampant"); *Minnick v. Mississippi,* — U.S. —, 111 S.Ct. 486, 497–98, 112 L.Ed.2d 489 (1990) (Scalia, J., dissenting) ("Today's extension … is the latest stage of prophylaxis built upon prophylaxis, producing a veritable fairyland castle of imagined constitutional restriction. . . . [T]his protective enterprise is beyond our authority under the Fifth Amendment or any other provision of the Constitution. . . ."). Even if such power exists, however, it surely may not be exercised where it conflicts with a positive rule of law. Here, whatever constitutional common law authority the federal courts may enjoy is displaced by Fed.R.Crim.P. 41 which, the Supreme Court has told us, governs the issuance of warrants not covered by Title I. *New York Telephone,* 434 U.S. at 168–70, 98 S.Ct. at 370–71. While we must disregard Rule 41 where the Constitution so commands, we surely may not do so merely to serve "constitutional values" where the Constitution does not actually require it.

## C

No less troubling than my colleagues' unauthorized augmentation of the Consti-

tution is their detraction from it. After setting forth several requirements culled from Title I, my colleagues declare themselves "satisfied" that these will "guard against unreasonable video searches and seizures." Maj. op. at 542. How can we possibly tell? What assurance do we have that compliance with these requirements will, in every single case, avoid an unreasonable search and seizure?

My colleagues overlook that reasonableness is an independent requirement of the Fourth Amendment, over and above the Warrant Clause requirements of probable cause and particularity. *See Torres,* 751 F.2d at 883 ("a search could be unreasonable, though conducted pursuant to an otherwise valid warrant, by intruding on personal privacy to an extent disproportionate to the likely benefits from obtaining fuller compliance with the law."); Amar, *The Bill of Rights as a Constitution,* 100 Yale L.J. 1131, 1178 (1991) (Fourth Amendment "actually contains two different commands"). The Supreme Court has held that even where the government shows probable cause, describes the scope of the search with particularity and complies with every other procedural requirement for issuance of a warrant, the court still must inquire into the "extent of the intrusion on [the individual's] privacy interests and on the State's need for the evidence." *Winston v. Lee,* 470 U.S. 753, 763, 105 S.Ct. 1611, 1618, 84 L.Ed.2d 662 (1985).

The Court in *Winston* considered a warrant allowing the state to perform minor surgery on a suspect to remove a bullet that would provide evidence as to the suspect's involvement in a crime. The Court held the search unreasonable, even though the state scrupulously complied with the procedural requirements for issuance of a warrant:

> The operation sought will intrude substantially on respondent's protected interests. The medical risks of the operation, although apparently not extremely severe, are a subject of considerable dispute; the very uncertainty militates against finding the operation to be "reasonable." In addition, the intrusion on

respondent's privacy interests entailed by the operation can only be characterized as severe. On the other hand, although the bullet may turn out to be useful to the Commonwealth in prosecuting respondent, the Commonwealth has failed to demonstrate a compelling need for it.

*Id.* at 766, 105 S.Ct. at 1619–20. More generally the Court noted that "the Fourth Amendment's command that searches be 'reasonable' requires that when the State seeks to intrude upon an area in which our society recognizes a significantly heightened privacy interest, a more substantial justification is required to make the search 'reasonable.'" *Id.* at 767, 105 S.Ct. at 1620.

In light of this admonition from the Supreme Court, which I read as calling for a fact-specific balancing of interest, whenever "the State seeks to intrude upon an area in which our society recognizes a significantly heightened privacy interest," I cannot understand how the majority can conclude that its procedures for silent video surveillance will *always* "guard against unreasonable video searches and seizures." Maj. op. at 542.

As every court considering the issue has noted, video surveillance can result in extraordinarily serious intrusions into personal privacy. Is it reasonable to place a camera in the home where it is likely to monitor people while they go to the bathroom, while they engage in intimate relations, while they cook and clean, while they sweep dirt under the rug? If such intrusions are ever permissible, they must be justified by an extraordinary showing of need. A video warrant for the home might be justifiable to establish a serious breach of national security, such as where authorities have probable cause to believe that a government official is using his residence to transfer military secrets to our enemies. Probable cause to believe suspects will commit a misdemeanor in the privacy of the marital bedroom would not—I should hope—justify a warrant for video surveillance, no matter how scrupulously the authorities comply with procedural require-ments and how badly they may need the evidence to establish the offense.

My final objection to the majority's code of procedure is thus a variant of the first: By rushing to develop a code that will comprehensively deal with video warrants on its first outing in the field, my colleagues have overreached. Attempting the task normally reserved to the political branches, they have abdicated the adjudicatory function while undertaking the task of legislation badly. The result is that they have shackled the government with more restrictions than the Constitution imposes, while at the same time giving citizens less protection than the Constitution affords them.

### D

Perhaps this is a hurricane in a bottle. As the Seventh Circuit has noted, the procedure applicable to video surveillance warrants is not all that important because the United States generally applies for them at the same time as it seeks warrants for audio surveillance, which clearly are covered by Title I. *See Torres,* 751 F.2d at 885. The constraints imposed by the court and other circuits thus not only had no practical effect in the cases at issue, but have practically no effect on the world at large. It is nevertheless troubling that circuit after circuit has embarked on a legislative frolic and detour that is constitutionally unsupported and prudentially ill-advised. That we are, for all intents and purposes, shielded from the rigors of the adversary process and Supreme Court review counsels more caution, greater restraint, a more thorough explanation of what we are doing and why. The majority's summary adoption of a code of procedure for video surveillance and its unskeptical deference to the rationale of other circuits is, I respectfully suggest, not consistent with the responsibility that devolves upon us as a court established under Article III of the Constitution.