**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Jesus Fernando CUEVAS–SANCHEZ, Defendant-Appellant.**

**No. 86–1665.**

United States Court of Appeals, Fifth Circuit.

June 29, 1987.

Salvador C. Ramirez, Robert P. Harris, El Paso, Tex., for Cuevas-Sanchez.

John F. DePue, Atty., Dept. of Justice, Crim. Div., Washington, D.C., Helen M. Eversberg, U.S. Atty., San Antonio, Tex., for U.S.

Before WRIGHT[*], GEE, and JOLLY, Circuit Judges.

GEE, Circuit Judge:

Jesus Fernando Cuevas-Sanchez appeals his conviction of possession of marijuana with intent to distribute. In the district court, Cuevas moved to suppress the evidence used to convict him on the ground that it was derived from the unlawful video surveillance of his property. The district court denied this motion and, after Cuevas waived a jury trial, found him guilty. Cuevas raises only the suppression issue in his appeal.

In early 1986, federal law enforcement agents suspected that Cuevas's home was being used as a drop house for drug traffickers. On March 13, the United States Attorney for the Western District of Texas applied to the district court for an order authorizing video surveillance of the exterior of Cuevas's property. The application included a letter from the Director, Office of Enforcement Operations of the Department of Justice Criminal Division, authorizing the application and an extensive affidavit from a narcotics detective describing the premises and the reasons behind the police's suspicions. The affidavit provided information gathered from confidential informants as well as from police surveillance of the property. The affidavit also contained a false statement that the appellant had been arrested while in possession of 47 grams of cocaine. Finally, it explained that conventional law enforcement techniques, although attempted, had failed to uncover enough evidence to convict the drug traffickers. The order issued that same day, limiting surveillance to 30 days

[*] Circuit Judge of the Ninth Circuit, sitting by designation.

and directing the police to minimize observation of innocent conduct and to discontinue the surveillance when none of the suspected participants were on the premises.

On March 19, Agents installed the video camera atop a power pole overlooking the appellant's 10–foot-high fence bordering the back of the yard.[1] This camera allowed officers to observe the removal of drugs from vehicles' false gas tanks in Cuevas's yard; observations that led to the arrest of another participant in the drug ring. On April 30, the United States Attorney asked for an extension of the video surveillance order based on an additional affidavit that included information obtained from the first 30 days of surveillance. A district judge granted the extension on May 5. On May 15, the video surveillance revealed the appellant loading his car with garbage bags believed by the monitors to contain drugs. After he drove off, police stopped Cuevas and made a warrantless search of his car, finding 22 pounds of marijuana. They then obtained a warrant to search his property and found 58 more pounds.

The appellant argues that the government's application for the surveillance order did not conform to statutory or constitutional standards; therefore, the initial stop, based upon information obtained from the surveillance, was tainted and illegal. He also argues that a false statement contained in the affidavit supporting the government's application for surveillance voided the entire order.

■ The government first attempts to bypass Cuevas's contentions by arguing that Cuevas "had no reasonable expectation of privacy in activities conducted in his backyard visible to a casual observer," and that therefore the government did not need an order to put the camera on top of the pole. For the factual basis of this argument it points out that activities in the driveways and on the southwestern portion of the property were visible from the street; that some of the activity in the rear portion was visible from the street; that because the east fence was only five to six feet high, a person of average height could observe activity from that vantage point; and finally that power company lineman on top of the pole or a policeman on top of a truck could peer over the 10–foot rear fence. For the legal basis it relies on *California v. Ciraolo*, 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), in which the Supreme Court held that the "Fourth Amendment simply does not require the police traveling in the public airways at [1,000 feet] to obtain a warrant in order to observe what is visible to the naked eye." *Id.* at 1813.[2] At first blush, this argument has a certain appeal. Close inspection, however, discloses the sophistry underlying the government's argument.

The government applied to a United States District Judge for authority to use a potentially indiscriminate and most intrusive method of surveillance. To justify its application, a narcotics officer swore that "conventional law enforcement techniques, such as debriefing defendants, undercover investigations, informants, and surveillance had been attempted but had failed...." Affidavit of Phil Harrold, Gov't Exhibit 1A at 13. Yet now the government argues, in effect, that conventional surveillance would have revealed the activities that led to Cuevas's arrest. It cannot have it both ways: "A juxtaposition of such contentions trifles with the Court." *United States v. de Luna*, 815 F.2d 301, slip op. at 3498 (5th Cir., 1987).

Furthermore, the government wishes to stretch *Ciraolo*'s holding far beyond its natural reach. *Ciraolo* reaffirmed the *Katz* fourth amendment analysis of whether a person has a constitutionally protected reasonable expectation of privacy. *Katz v. United States*, 389 U.S. 347, 360–62, 88 S.Ct. 507, 516–17, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). That analysis

---

1. The house faced south with residences on both sides, and the half-acre lot was enclosed by a 10–foot metal fence on the north; a five to six foot metal fence on the east; and a chain link fence on the west. A garage-like building was in the northwest corner.

2. In *Ciraolo*, the defendants were growing marijuana in their backyard. They had a 10–foot privacy fence protecting against any unwanted ground observations. The police flew over their property in a fixed-winged aircraft and identified the marijuana. They used this observation as the basis of the subsequent search warrant.

uses a two-part inquiry: "first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" *Ciraolo,* 106 S.Ct. at 1811. We do not doubt that Cuevas manifested the subjective expectation of privacy in his backyard necessary to satisfy the first part of the inquiry: he erected fences around his backyard, screening the activity within from views of casual observers. In addition, the area monitored by the camera fell within the curtilage of his home, an area protected by traditional fourth amendment analysis.

■ The second part focuses on "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Oliver v. United States,* 466 U.S. 170, 182–83, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984). To measure the government's intrusion we must consider the expectations of society. *Ciraolo* teaches us that a fly-over by a plane at 1,000 feet does not intrude upon the daily existence of most people; we must now determine whether a camera monitoring all of a person's backyard activities does. This type of surveillance provokes an immediate negative visceral reaction: indiscriminate video surveillance raises the spectre of the Orwellian state.[3] Here, unlike in *Ciraolo,* the government's intrusion is not minimal. It is not a one-time overhead flight or a glance over the fence by a passer-by. Here the government placed a video camera that allowed them to record all activity in Cuevas's backyard. It does not follow that *Ciraolo* authorizes any type of surveillance whatever just because one type of minimally-intrusive aerial observation is possible. Indeed, the Supreme Court recently denied review of a California Appeals Court decision suppressing evidence gained through the aerial observations of a helicopter hovering at 400 to 500 feet above the defendant's backyard.[4] *People v. Sabo,* 185 Cal.App.3d 845, 230 Cal.Rptr. 170 (4 Dist.1986), *cert. denied,* — U.S. —, 107 S.Ct. 2200, 95 L.Ed.2d 855 (1987). Cuevas's expectation to be free from this type of video surveillance in his backyard is one that society is willing to recognize as reasonable.

■ The government's actions therefore qualify as a search under the fourth amendment, entitling Cuevas to judicial protection. The government recognized the intrusiveness of the video camera by applying to the district court for an order authorizing it in the first place. We must determine whether the government's action in obtaining a court order sufficiently protected Cuevas's fourth amendment rights. The courts that have addressed this issue analyze a request for video surveillance under the statute permitting electronic aural surveillance—Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520. In this circuit, we have yet to address this question. We do so now.

Cuevas argues that the government did not meet all of the requirements of Title III in obtaining the surveillance order. Because Title III does not include video surveillance techniques, we must decide what standards should guide a court in issuing these orders; whether to adopt its technical requirements verbatim or to use Title III as a guide for the constitutional standard. The Second and Seventh Circuits have chosen the latter path. *See United States v. Biasucci,* 786 F.2d 504 (2nd Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986); *United States v. Torres,* 751 F.2d 875 (7th Cir.1984), *cert. denied,*

---

3. The telescreen received and transmitted simultaneously. Any sound that Winston made, above the level of a very low whisper, would be picked up by it; moreover, so long as he remained within the field of vision which the metal plaque commanded, he could be seen as well as heard. There was of course no way of knowing whether you were being watched at any given moment.
G. Orwell, *1984,* at 4 (Harcourt Brace Jovanovich ed., 1949).

4. George Orwell described similar activities in his portrait of the totalitarian state:
In the far distance a helicopter skimmed down between the roofs, hovered for an instant like a bluebottle, and darted away again with a curving flight. It was the Police Patrol, snooping into people's windows.
G. Orwell, *1984* at 4.

470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985). These two Courts considered a court's power to issue warrants and the constitutional standards governing valid warrants in all cases. They then borrowed the provisions in Title III that implement those constitutional standards for application in the context of video surveillance. Those provisions are:

(1) the judge issuing the warrant must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(3)(c); (2) the warrant must contain "a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates," *id.* § 2518(4)(c); (3) the warrant must not allow the period of interception to be "longer than is necessary to achieve the objective of the authorization, [ ]or in any event longer than thirty days" (though extensions are possible), *id.* § 2518(5); and (4) the warrant must require that the interception "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under [Title III]," *id.*

*Biasucci,* 786 F.2d at 510. We accept these as the standards under which an order for video surveillance may issue. We cannot add the other technical requirements of Title III because Title III does not cover video surveillance. We are not a legislature; we can mandate only those protections required by the Constitution. The above requirements protect the constitutional rights of those under surveillance as they have been announced by the Supreme Court.

■ The application of these standards undercuts Cuevas's primary contention. He complains that the letter of authorization did not come from the Attorney General or Assistant Attorney General as required in Title III, 18 U.S.C. § 2516. The Fourth Amendment does not require such a letter of authorization. Cuevas also attacks the extension of the order *only* after the expiration of the 30–day period. There

is no evidence that the government continued surveillance in the hiatus between the end of the 30–day period and the beginning of the extension period. Cuevas cannot complain of surveillance that followed the district court's order. The evidence shows that the government followed all the requirements set out in *Biasucci.*

■ Cuevas also contends that the false statement contained in the affidavit supporting the warrant application tainted the application and rendered the subsequent warrant invalid. *See Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). *Franks* held that if, setting aside an affidavit's false material, the remaining information is insufficient to establish probable cause, the warrant is void. The affidavit in this case, removing the one statement that Cuevas had been arrested while in possession of cocaine,[5] is still sufficient to establish probable cause. Cuevas's claim cannot survive.

Because the government followed the proper procedures in obtaining a court order for video surveillance, we AFFIRM the appellant's conviction.

---

**5.** The officer had actually arrested Fernando Cuevas-Sanchez, the appellant's brother, and similar to Jesus Fernando Cuevas-Sanchez in appearance.