**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Alphonso NERBER; Eduardo Alvarez; Alberto Betancourt; Ramon Betancourt–Rodriguez, Defendants–Appellees.**

No. 99–30161.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 10, 2000

Filed Aug. 24, 2000

Annette L. Hayes, Assistant United States Attorney, Office of the United States Attorney, Seattle, WA, for appellant.

Paula Semmes Deutsch, Assistant Federal Public Defender, Federal Public Defender's Office, Robert Goldsmith, Jon Zulauf, Ken Kanev, Seattle, WA, for appellees.

Before: JAMES R. BROWNING, FLETCHER, and GOULD, Circuit Judges.

Opinion by Judge JAMES R. BROWNING; Dissent by Judge GOULD.

JAMES R. BROWNING, Circuit Judge:

The government appeals an order of the district court suppressing evidence derived from video surveillance of a hotel room. For the reasons stated below, we affirm.

## I

On December 24, 1998, defendants Nerber and Betancourt–Rodriguez went to La Quinta Inn in Seattle to conduct a narcotics transaction with confidential informants. The informants brought defendants to Room 303. The FBI and the King County Police had rented the room for the operation and installed a hidden video camera without first obtaining a warrant. The parties entered the room at 9:54 a.m., the informants gave defendants one kilogram of sample cocaine, and the defendants briefly "flashed" money in a briefcase. The informants left the room at 10:00 a.m., telling defendants they would return to deliver 24 more kilograms of cocaine. They did not return, however, because they believed defendants intended to rob them. For three hours thereafter, law enforcement agents used the surveillance equipment to monitor defendants' activities in the hotel room. They observed the other two defendants—Betancourt and Alvarez—enter the room, and watched as the defendants brandished weapons and sampled cocaine. All four defendants left the hotel at approximately 1:00 p.m. and were arrested shortly thereafter.

A grand jury returned an indictment charging all four defendants with narcotics offenses and two with possessing a firearm during the commission of a narcotics offense. Defendants moved to suppress the evidence derived from the video surveillance. The district court originally denied the motion, and later denied a motion for reconsideration, on the theory that defendants had "no legitimate expectation of privacy in a motel room used purely for a drug transaction, for a short period of time." However, the court granted a second motion for reconsideration and suppressed "all evidence obtained from the portion of the video surveillance which oc-

curred after the confidential informants left Room 303...." The court ruled that although the video surveillance which took place in the presence of the informants was admissible based on their consent, defendants nonetheless "had a reasonable expectation that they would not be subject to video surveillance while in Room 303 after the confidential informants left the room." The government appeals this ruling.

## II

■ The Fourth Amendment protects people rather than places, but "the extent to which the Fourth Amendment protects people may depend upon where those people are." *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). To invoke the protections of the Fourth Amendment, a person must show he had a "legitimate expectation of privacy." To establish a "legitimate" expectation of privacy, he must demonstrate a subjective expectation that his activities would be private, and he must show that his expectation was "'one that society is prepared to recognize as reasonable.'" *Bond v. United States*, —— U.S. ——, ——, 120 S.Ct. 1462, 1465, 146 L.Ed.2d 365 (2000) (quoting *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)); *see also Rakas v. Illinois*, 439 U.S. 128, 143–44, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).[1]

We review for clear error the district court's underlying factual findings, and we review de novo the lawfulness of a search and seizure. *See United States v. Hudson*, 100 F.3d 1409, 1414 (9th Cir.1996). Whether a citizen's expectation of privacy was objectively reasonable is a question of law reviewed de novo. *See United States v. Fultz*, 146 F.3d 1102, 1104 (9th Cir. 1998).

---

1. Although this issue is often discussed in terms of "standing" to invoke the Fourth Amendment, the Supreme Court has repeatedly cautioned against invoking this concept: "[I]n determining whether a defendant is able to show the violation of his ... Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'" *Carter*, 525 U.S. at 88, 119 S.Ct. 469 (quoting *Rakas*, 439 U.S. at 140, 99 S.Ct. 421).

## III

■ In finding for defendants, the district court distinguished *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), in which the Supreme Court held that the defendants had no legitimate expectation of privacy in another person's apartment which they entered for a brief period to conduct a narcotics transaction. The district court held that *Carter* was not controlling because the governmental intrusion in this case (the use of a hidden surveillance camera) was far more egregious than the intrusion in *Carter* (visual observation through a ground-floor apartment window).[2]

The government responds that the severity of the intrusion is irrelevant to whether a defendant has a legitimate expectation of privacy in a particular place. Once the severity of the intrusion is removed from the equation, the government argues, this case is indistinguishable from *Carter*, which compels a ruling that the defendants may not invoke the protection of the Fourth Amendment.

■ We reject the government's broad argument that a court may never consider the severity of the governmental intrusion in determining whether a citizen has a legitimate expectation of privacy. To adopt the government's position would be to ignore a substantial body of Supreme Court and appellate case law, including the recent Supreme Court decision in *Bond v. United States*, —— U.S. ——, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000). Furthermore, after considering the totality of the circumstances of this case, including but not limited to the nature of the governmental intrusion, we conclude that the defendants had a legitimate expectation to be free from secret video surveillance once the informants left the room.

### A.

In *Carter*, a police officer investigating a tip from a confidential informant looked into the window of a ground-floor apartment through a gap in the blinds and observed people putting white powder into bags. 525 U.S. at 85, 119 S.Ct. 469. The defendants, who did not live in the apartment but had come to engage in the narcotics transaction, moved to suppress the evidence derived from the officer's observations. The Court ruled they could not invoke the Fourth Amendment:

> If we regard the overnight guest … as typifying those who may claim the protection of the Fourth Amendment in the home of another, and one merely "legitimately on the premises" as typifying those who may not do so, the present case is obviously somewhere in between. But the purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between respondents and the householder, all lead us to conclude that respondents' situation is closer to that of one simply permitted on the premises. We therefore hold that any search which may have occurred did not violate their Fourth Amendment rights.

*Id.* at 91, 119 S.Ct. 469. The Court went on to state that because the non-resident defendants had no legitimate expectation of privacy in the apartment, there was no need to decide whether the officer's observations constituted a "search" within the meaning of the Fourth Amendment. *See id.*

The government urges us to read *Carter* as holding that when a court assesses the

---

2. For Fourth Amendment purposes, a hotel room is treated essentially the same, if not exactly the same, as a home. *See, e.g., Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) ("No less than a tenant of a house … a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures.") (citing *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948)); *see also United States v. Grandstaff,* 813 F.2d 1353, 1357 (9th Cir.1987); *United States v. Lyons,* 706 F.2d 321, 326 (D.C.Cir.1983); *United States v. Fisch,* 474 F.2d 1071, 1078 (9th Cir.1973).

legitimacy of a citizen's privacy expectation, it may never take into account the severity of the governmental intrusion. But numerous Supreme Court and appellate decisions—handed down before and after *Carter*—suggest a contrary principle: the legitimacy of a citizen's expectation of privacy in a particular place may be affected by the nature of the intrusion that occurs.

This principle was first articulated in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), which gave rise to the "legitimate expectation of privacy" requirement. In *Katz*, the Supreme Court suppressed evidence of the defendant's end of telephone conversations overheard by FBI agents who had attached an electronic listening device to the outside of a public phone booth:

> [T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.... But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.... The Government stresses the fact that the telephone booth from which the petitioner made his calls was constructed partly of glass, so that he was as visible after he entered it as he would have been had he remained outside. But what he sought to exclude when he entered the booth was not the intruding eye-it was the uninvited ear. He did not shed his right to do so simply because he made his calls from a place where he might be seen.

*Katz*, 389 U.S. at 351–52, 88 S.Ct. 507. Thus, a person in a glass phone booth had a legitimate expectation that his phone conversation would not be intercepted, even though he could not legitimately expect that his activities within the booth would not be observed.

The Court applied the same principle in *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), in which it held that a citizen has no legitimate expectation to be free from having his luggage subjected to a "canine sniff" by a narcotics detection dog. The Court recognized that "a person possesses a privacy interest in luggage that is protected by the Fourth Amendment," but held that because a canine sniff "is much less intrusive than a typical search," a citizen may not invoke the protections of the Fourth Amendment to suppress narcotics discovered by that means. *Id.* at 707, 103 S.Ct. 2637.

In *Bond*, the Court reaffirmed the general principle that the nature of the intrusion by the government can have an effect on whether a citizen has a legitimate expectation of privacy. There, a Border Patrol agent boarded a bus traveling between California and Arkansas, checked the immigration status of its passengers, randomly squeezed the defendant's canvas bag that was stored in the overhead compartment, and discovered a brick of methamphetamine. *Bond*, 120 S.Ct. at 1463–64. The Court held that the agent's warrantless manipulation of the bag violated the Fourth Amendment, because the defendant had a reasonable expectation that he would not be subjected to such a severe intrusion into his privacy. *Id.* at 1465. The Court said:

> [T]he Government asserts that by exposing his bag to the public, petitioner lost a reasonable expectation that his bag would not be physically manipulated. The Government relies on our decisions in *California v. Ciraolo*, [476 U.S. 207, 106 S.Ct. 1809 (1986)], and *Florida v. Riley*, 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989), for the proposition that matters open to public observation are not protected by the Fourth Amendment. In *Ciraolo*, we held that police observation of a backyard from a plane flying at an altitude of 1,000 feet did not violate a reasonable expectation of privacy. Similarly, in *Riley*, we relied on *Ciraolo* to hold that police observation of a greenhouse in a home's curtilage from

a helicopter passing at an altitude of 400 feet did not violate the Fourth Amendment.... *But Ciraolo and Riley are different from this case because they involved only visual, as opposed to tactile, observation. Physically invasive inspection is simply more intrusive than purely visual inspection.*

*Bond,* 120 S.Ct. at 1464 (emphasis added).

This principle has been applied in several Court of Appeals decisions as well. In *United States v. Taketa,* 923 F.2d 665 (9th Cir.1991), government agents, who suspected DEA agent O'Brien of wrongdoing, physically searched his office and installed a hidden surveillance camera. The camera caught O'Brien and a co-worker, Taketa, conducting an illegal wiretapping operation. We ruled that although Taketa did not have "standing" to challenge the physical search of O'Brien's office, he *could* invoke the Fourth Amendment to suppress the video surveillance of himself:

> Here, Taketa has no general privacy interest in O'Brien's office, but he may have an expectation of privacy against being videotaped in it.... Persons may create temporary zones of privacy within which they may not be videotaped ... even when that zone is a place they do not own or normally control, and in which they might not be able reasonably to challenge a search at some other time or by some other means.

*Id.* at 676–77.

In *United States v. Cuevas–Sanchez,* 821 F.2d 248 (5th Cir.1987), the court ruled that the installation of a surveillance camera on a power pole to videotape activities in a suspect's backyard constitutes a "search" within the meaning of the Fourth Amendment. The Fifth Circuit, like the Supreme Court in *Bond,* distinguished cases involving surveillance of property from the air:

> To measure the government's intrusion we must consider the expectations of

society. *Ciraolo* teaches us that a fly-over by a plane at 1,000 feet does not intrude upon the daily existence of most people; we must now determine whether a camera monitoring all of a person's backyard activities does. This type of surveillance provokes an immediate negative visceral reaction: indiscriminate video surveillance raises the spectre of the Orwellian state. Here, unlike in *Ciraolo,* the government's intrusion is not minimal. It is not a one-time overhead flight or a glance over the fence by a passer-by. Here the government placed a video camera that allowed them to record all activity in Cuevas's backyard. It does not follow that *Ciraolo* authorizes any type of surveillance whatever just because one type of minimally-intrusive aerial observation is possible.... Cuevas's expectation to be free from this type of video surveillance in his backyard is one that society is willing to recognize as reasonable.

*Cuevas–Sanchez,* 821 F.2d at 251. While Cuevas had no legitimate expectation to be free from occasional "snooping" into his backyard from a passing airplane, he did have a legitimate expectation to be free from constant video surveillance.

The First Circuit also recognized this principle in *Vega–Rodriguez v. Puerto Rico Telephone Co.,* 110 F.3d 174 (1st Cir. 1997), holding that employees of a quasi-public telephone company had no legitimate expectation to be free from videotaping in an "open and undifferentiated work area," but emphasizing that "[t]he precise extent of an employee's expectation of privacy *often turns on the nature of an intended intrusion.*" *Id.* at 180 (emphasis added).[3] *See also State of Indiana v. Thomas,* 642 N.E.2d 240, 244 (Ind.Ct.App. 1994) ("In determining the reasonableness of a person's expectation of privacy on these facts, a correct analysis requires that we also consider ... the degree of intru-

---

**3.** The intrusion in *Vega–Rodriguez* was relatively minor, because the surveillance was limited to common areas and the company "notified its work force in advance that video cameras would be installed and disclosed the cameras' field of vision." *Id.*

sion inherent in the continuous nature of video surveillance").[4]

The unmistakable message of these cases is that the legitimacy of a person's expectation of privacy may depend on the nature of the intrusion. In assessing defendants' expectation of privacy under the facts of this case, we must consider the severity of the intrusion to which they were subjected.

## B.

■ ] The district court did not err in finding that defendants had a subjective expectation not to be videotaped in the hotel room. In addition to closing the door, drawing the blinds, and exercising dominion over the room after the informants left at 10:00 a.m., defendants ingested cocaine and brandished weapons in a way they clearly would not have done had they thought outsiders might see them.

■ The objective reasonableness of defendants' privacy expectation presents a closer question. The governmental intrusion was severe. Hidden video surveillance is one of the most intrusive investigative mechanisms available to law enforcement. The sweeping, indiscriminate manner in which video surveillance can intrude upon us, regardless of where we are, dictates that its use be approved only in limited circumstances. As we pointed out in *Taketa*, the defendant had a reasonable expectation to be free from hidden video surveillance because "the video search was directed straight at him, rather than being a search of property he did not own or control .... [and] the silent, unblinking lens of the camera was intrusive in a way that no temporary search of the office could have been." *Id.* at 677. As Judge Kozinski has stated, "every court considering the issue has noted [that] video surveillance can result in extraordinarily serious intrusions into personal privacy.... If such intrusions are ever permissible, they must be justified by an extraordinary showing of need." *United States v. Koyomejian*, 970 F.2d 536, 551 (9th Cir.1992) (Kozinski, J., concurring). And, as the Fifth Circuit said, hidden video surveillance invokes images of the "Orwellian state" and is regarded by society as more egregious than other kinds of intrusions. *Cuevas–Sanchez*, 821 F.2d at 251. *See also United States v. Mesa–Rincon*, 911 F.2d 1433, 1442 (10th Cir.1990) ("Because of the invasive nature of video surveillance, the government's showing of necessity must be very high to justify its use"); *United States v. Torres*, 751 F.2d 875, 882 (7th Cir.1984) ("We think it ... unarguable that television surveillance is exceedingly intrusive, especially in combination (as here) with audio surveillance, and inherently indiscriminate, and that it could be grossly abused-to eliminate personal pri-

---

4. This principle is also apparent in the lengthy string of state court cases holding that citizens have a reasonable expectation not to be secretly surveilled inside a public bathroom stall. *See, e.g., People v. Dezek*, 107 Mich.App. 78, 308 N.W.2d 652, 655 (1981); *People v. Triggs*, 8 Cal.3d 884, 106 Cal.Rptr. 408, 506 P.2d 232, 236 (1973) (overruled on other grounds, *People v. Lilienthal*, 22 Cal.3d 891, 150 Cal.Rptr. 910, 587 P.2d 706 (1978)); *Buchanan v. State*, 471 S.W.2d 401, 404 (Tex. Crim.App.1971); *State v. Bryant*, 287 Minn. 205, 177 N.W.2d 800, 802–03 (1970); *Brown v. State*, 3 Md.App. 90, 238 A.2d 147, 149–50 (1968); *Bielicki v. Superior Court of Los Angeles County*, 57 Cal.2d 602, 21 Cal.Rptr. 552, 371 P.2d 288, 290 (1962); *Britt v. Superior Court of Santa Clara County*, 58 Cal.2d 469,

24 Cal.Rptr. 849, 374 P.2d 817, 818–19 (1962). These cases stand for the proposition that although a citizen's privacy interest in a public bathroom stall may not be as strong as in the home, there remain certain kinds of warrantless searches in public bathroom stalls from which citizens are protected by the Fourth Amendment.

In *Smayda v. United States*, 352 F.2d 251, 255–56 (9th Cir.1965), the majority held that defendants were not protected from observation by law enforcement officers through a hole in the ceiling of a public bathroom stall. *Smayda* is no longer good law, however, because it was decided prior to *Katz* and does not apply the analysis adopted by *Katz* and subsequent Supreme Court decisions.

vacy as understood in modern Western nations").

Despite the pause the government's use of video surveillance gives us, we agree with the district court that defendants had no reasonable expectation that they would be free from hidden video surveillance while the informants were in the room. Defendants' privacy expectation was substantially diminished because of where they were. They were not "residents" of the hotel, they were not overnight guests of the occupants, and they were there solely to conduct a business transaction at the invitation of the occupants, with whom they were only minimally acquainted. Moreover, as the parties agree, when the informants were in the room the video surveillance was conducted with their consent, and defendants bore the risk that their activities with the informants were being surveilled. *Cf. Hoffa v. United States,* 385 U.S. 293, 302, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). These factors coalesce to support the district court's finding that the defendants may not invoke the Fourth Amendment to suppress the evidence gathered during this period.[5]

■ We also agree with the district court, however, that once the informants left the room, defendants' expectation to be free from hidden video surveillance was objectively reasonable. When defendants were left alone, their expectation of privacy increased to the point that the intrusion of a hidden video camera became unacceptable. People feel comfortable saying and doing things alone that they would not say or do in the presence of others. This is clearly true when people are alone in their own home or hotel room, but it is also true to a significant extent when they are in someone else's home or hotel room. Even if one cannot expect total privacy while alone in another person's hotel room (i.e., a maid might enter, someone might peek through a window, or the host might reenter unannounced), this diminished privacy interest does not eliminate society's expectation to be protected from the severe intrusion of having the government monitor private activities through hidden video cameras.[6]

■ The fact that society is prepared to accept as reasonable defendants' expectation to be free from video surveillance while alone in the hotel room is confirmed by the way the law treats audio surveillance in identical circumstances. The government *conceded* that audio surveillance conducted after the informants departed was inadmissible, because the federal wiretap statute permits warrantless audio surveillance only if one of the participants in the monitored conversation consents.[7] Absent such consent, the government must

5. We do not intend to imply that video surveillance is justifiable whenever an informant is present. For example, we suspect an informant's presence and consent is insufficient to justify the warrantless installation of a hidden video camera in a suspect's home. We hold only that when defendants' privacy expectations were already substantially diminished by their presence in another person's room to conduct a brief business transaction, the presence and consent of the informants was sufficient to justify the surveillance.

6. *United States v. McIver,* 186 F.3d 1119, 1125–26 (9th Cir.1999), cited extensively by the government, is distinguishable in this respect. There, the defendants conducted a marijuana grow operation in a *national forest,* and were caught on tape by motion-activated video cameras installed by law enforcement. The court ruled that the defendants could not

invoke the Fourth Amendment, but said its holding was "quite narrow":

> Illegal activities conducted on government land open to the public which may be viewed by any passing visitor or law enforcement officer are not protected by the Fourth Amendment because there can be no reasonable expectation of privacy under such circumstances. We are mindful that a person can have a reasonable expectation of privacy in a hotel room, a cabin, or an enclosed tent on public lands.... Here, [defendants] did not conceal their marijuana garden.

186 F.3d at 1125–26.

7. "It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the

obtain a warrant and satisfy the statute's stringent particularity requirements.[8] The limitations in the wiretap statute reflect a societal determination that the threat to liberty inherent in audio surveillance requires that this intrusive investigative technique be permitted only in limited circumstances. *See, e.g., United States v. King,* 478 F.2d 494, 505 (9th Cir.1973) ("The Act's procedures were designed to protect the general public from the abuse of the awesome power of electronic surveillance"). Although no federal statute regulates the government's use of video surveillance, the existence of a law which prohibits the warrantless use of audio surveillance on a citizen alone in another person's hotel room is strong evidence that society is not prepared to accept the warrantless use of an even more intrusive investigative tool in the same situation. "Television surveillance is identical in its indiscriminate character to wiretapping and bugging. It is even more invasive of

privacy, just as a strip search is more invasive than a pat-down search ..." *Torres,* 751 F.2d at 885. *See also Mesa–Rincon,* 911 F.2d at 1437 (stating that "video surveillance can be vastly more intrusive" than audio surveillance).[9] Defendants' expectation to be free from hidden video surveillance when alone in the hotel room was, therefore, objectively reasonable.[10]

In sum, although the video surveillance conducted while the informants were present is admissible, defendants had a legitimate expectation to be free from such surveillance after they were left alone in the hotel room. Because the government infringed upon defendants' expectation of privacy without first obtaining a warrant, the Fourth Amendment requires that the fruits of the surveillance be suppressed.

### C.

■ This holding places a negligible burden on law enforcement. The control-

---

communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(c).

**8.** 18 U.S.C. § 2518(4) provides, *inter alia:* 1) a judge issuing a warrant to conduct audio surveillance must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or be too dangerous"; 2) the warrant must describe the nature and location of the place where authority to intercept is granted; 3) the warrant must contain "a particular description of the type of communication sought to be intercepted"; 4) the time period for which the interception is authorized must be limited.

**9.** This circuit has joined numerous others in holding that the Fourth Amendment imposes similar warrant requirements on the government's use of video surveillance as the wiretap statute imposes upon the use of audio surveillance. *See Koyomejian,* 970 F.2d at 542.

**10.** The dissent suggests that because the defendants were in a room rented and controlled by government agents, "invited informer" cases such as *United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) and *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966)

support a finding that there was no reasonable expectation of privacy even when the informants left the room. However, every "invited informer" case we are aware of involved a defendant voluntarily sharing his words or revealing his actions to a government agent. *See, e.g., White,* 401 U.S. at 749, 91 S.Ct. 1122 (Fourth Amendment provides "no protection to 'a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it'") (quoting *Hoffa,* 385 U.S. at 302, 87 S.Ct. 408); *Wang v. United States,* 947 F.2d 1400, 1403 (9th Cir.1991) ("The invited informer doctrine makes clear that the Wangs did not have a reasonable expectation of privacy in their voluntary conversations with [the informer] or in the documents which they voluntarily provided to [the informer]"); *United States v. Aguilar,* 883 F.2d 662, 697–98 (9th Cir.1989) (invited informer cases permit "consensual recording of conversations without warrants" but "informer may not search for evidence not voluntarily revealed by the unsuspecting criminal") (internal quotations omitted). Thus, while these cases lend support to our conclusion that defendants had no reasonable expectation of privacy when the informants were present, the doctrine is of questionable relevance to the period in which defendants were alone, because they were no longer voluntarily revealing their actions to the informants.

ling fact is not that defendants were videotaped in a hotel room, but that they were videotaped alone in a hotel room without a warrant. In all likelihood the agents in this case could have obtained a warrant to place a hidden camera in Room 303 by satisfying the warrant requirements for video surveillance set forth in *Koyomejian*, 970 F.2d at 542. They had sufficient time to do so, and a warrant would probably have ensured that defendants' constitutional rights would not be violated if the informants left the room.[11] We hold only that the Fourth Amendment protects citizens from secret video surveillance in another person's hotel room without a warrant or the consent of a participant in the monitored activity.

## IV.

We uphold the district court's finding that defendants had a legitimate expectation to be free from secret video surveillance once the informants left the room.

AFFIRMED

GOULD, Circuit Judge, dissenting:

I respectfully dissent because, in this case with nationwide importance to law enforcement, the majority inexplicably disregards controlling precedent of the United States Supreme Court. First and foremost, this case is clearly, fairly and inescapably controlled by *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). In that case, the United States Supreme Court held that the subjects of warrantless surveillance had no reasonable expectation of privacy in an apartment rented by another person where (a) they were in the apartment only for a short period of time, (b) they

were there solely to conduct a commercial transaction (to divide a quantity of cocaine into bags), and (c) they had no previous connection or relationship with the lessee. *See id.* at 90, 119 S.Ct. 469. Here, the very same factors are present: The surveillance of defendants took place in a hotel room rented by law enforcement agents on behalf of government informants. Defendants were present in the room for only two hours. They were there solely to conduct a "commercial" transaction (a cocaine purchase). And they had no previous connection or personal relationship with the FBI agents and King County Police who had rented the room, nor is there any suggestion that defendants had a substantial personal relationship with the informants. The Supreme Court's holding and rationale in *Minnesota v. Carter* compel the correct conclusion that defendants had no reasonable expectation of privacy.

This conclusion is only reinforced by the fact that defendants were in a room rented and controlled by government agents for use by informants. It was within the informants' room that defendants were seeking to participate in an illegal drug transaction and ultimately brandished their firearms, albeit at a time when the informants had left the room. *See United States v. White*, 401 U.S. 745, 749, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) ("no protection to a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.") (plurality opinion; citation and internal quotation omitted); *Hoffa v. United States*, 385 U.S. 293, 314, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) ("The risk of being overheard by an eavesdropper or betrayed by an informer

11. But see Judge Kozinski's persuasive argument that satisfying the warrant requirement may not be sufficient in all video surveillance cases: "Probable cause to believe suspects will commit a misdemeanor in the privacy of the marital bedroom would not—I should hope—justify a warrant for video surveillance, no matter how scrupulously the authorities comply with procedural requirements and

how badly they may need the evidence to establish the offense." *Koyomejian*, 970 F.2d at 551 (Kozinski, J., concurring). *See also Torres*, 751 F.2d at 883 ("a search could be unreasonable, though conducted pursuant to an otherwise valid warrant, by intruding on personal privacy to an extent disproportionate to the likely benefits from obtaining fuller compliance with the law").

or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society.") (quoting *Lopez v. United States,* 373 U.S. 427, 465, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963) (Brennan, J., dissenting)); *United States v. Little,* 753 F.2d 1420, 1435 (9th Cir. 1984) (Fourth Amendment does not protect wrongdoer's "misplaced confidences"). Where the room rented by others and used by defendants for a transient illegal purpose was indeed rented by government agents for use by informants, it is even more clear that defendants had neither a legitimate nor a reasonable expectation of privacy because *Minnesota v. Carter* applies with more force when combined with the informant cases.

Those who would hatch illicit plots to traffic in drugs while brandishing firepower should rent their own rooms.