# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2647

_____

United States of America,

    Plaintiff - Appellee,

v.

Emilio Corona-Chavez,

    Defendant - Appellant.

\*
\*
\*
\*  Appeal from the United States
\*  District Court for the
\*  District of Minnesota.
\*
\*
\*

_____

Submitted:  December 10, 2002

Filed:  May 15, 2003

_____

Before WOLLMAN, JOHN R. GIBSON, and MELLOY, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Emilio Corona-Chavez[1] appeals his conviction of conspiracy and aiding and abetting an attempt to possess more than 500 grams of a methamphetamine mixture with intent to distribute it, 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 (2000), and 21 U.S.C. § 2 (2000) (attempt and conspiracy). Corona was caught in a controlled delivery that was monitored by police using video and audio surveillance of the hotel

_____

[1]Corona-Chavez refers to himself as Corona, and so will we.

room where the delivery took place. He contends that the district court[2] erred in denying his motion to suppress the videotape of the transaction and a recording of a telephone call in which he participated. We hold that neither recording was obtained in contravention of Corona's constitutional or statutory rights. Accordingly, we affirm his conviction.

On August 6, 2001, at a highway rest stop in Wyoming, police stopped Maria Munoz, who was driving a Ford Excursion that contained nineteen bags of methamphetamine. Munoz told police that she was supposed to deliver the drugs to a man named Carlos in Minnesota, and she agreed to participate in a controlled delivery of the drugs. At the direction of the police, Munoz called Carlos that evening and told him that her car had broken down in Lincoln, Nebraska, but that she would be in Minnesota as soon as she could. Also at the request of the police, Munoz told Carlos that there was a bad smell in the car. The next day, police loaded Munoz and the Excursion on an airplane and flew them to Minneapolis.

At the direction of the police and in their presence, Munoz called Carlos from her cell phone at about 12:45 in the afternoon. Police recorded the call. Munoz told Carlos that a hose on the car had broken and she had to stay overnight in Lincoln to get it fixed, but that she would be in Minnesota in five or six hours. She complained to him that there was an alcohol-acetone smell in the car that was making her and her passengers sick. The case agent testified at trial that methamphetamine has a strong alcohol-acetone odor.

Police rented two adjacent hotel rooms at the downtown St. Paul Holiday Inn. They installed Munoz in one room and set up that room for video and audio surveillance. The audio surveillance was conducted by two recording devices: a

---

[2]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

microphone in the video camera and a body wire on Munoz. They used the adjoining room to monitor the surveillance. At about 6:15 that same day, Munoz again called Carlos from her cell phone. Again, police were present during the call and they recorded the conversation. Munoz told Carlos where she was and that she was not feeling well. Carlos put someone else on the telephone to get the directions to the Holiday Inn. Carlos Gaytan testified at trial that he participated in the call, and it was Emilio Corona who got on the line to get the directions. The recording of the telephone call was introduced into evidence at trial.

Shortly after the telephone call, Carlos Gaytan arrived at the hotel room, accompanied by Emilio Corona and Jaime Corona. Munoz testified at trial that she did not know Corona before he walked in the room, but that he told her he had talked to her on the phone. When they walked in the room, Gaytan handed Munoz $1,000. Munoz gave Gaytan a Ford key, which was supposed to be for the Ford Excursion, but which was actually a dummy key. Munoz complained to Gaytan that she was dizzy and felt bad because of the smell in the car, and Gaytan explained that "they probably hadn't fixed everything well." The conversation was in Spanish, and Emilio Corona said something which the case agent translated as meaning, "They were high," apparently referring to the effect of the odor in the car on Munoz and her passengers. At trial, the government introduced the audio-videotape of the meeting.

The three men left the room after about five minutes and went to the hotel parking lot. Emilio Corona walked up to the Excursion with the dummy key in his hand and tried to get in. Police arrested the men.

Corona moved to suppress the recording of the telephone call and the audio and video recordings of him in the hotel room. The motion was referred to a Magistrate Judge,[3] who conducted an evidentiary hearing. The case agent testified that he sat

---

[3]United States Magistrate Judge Jonathan Lebedoff.

down with Munoz before the meeting in the hotel room and asked for permission to videotape what went on in the hotel room and to record the conversation that took place there. Munoz gave her consent.

The Magistrate Judge understood the videotape to be a silent recording, rather than one that included a soundtrack. He held that Corona had no expectation of privacy in Munoz' hotel room, and therefore the videotaping did not violate his Fourth Amendment rights. As for the recording of the telephone conversation, the Magistrate Judge remarked that the government presented no evidence that Munoz explicitly consented in advance to the taping of the conversation. However, he concluded that the facts supported an inference that Munoz consented to the taping in that Munoz told police about the planned transaction and agreed to cooperate in a controlled delivery and she gave the police the keys to the Excursion. On the same day as the phone conversation, she agreed to be wired for sound and consented to the videotaping of the delivery of the events in the hotel room. The Magistrate Judge therefore recommended a finding of prior consent to the phone recording by one party to the conversation, which rendered lawful the interception of the conversation. The district court adopted the Magistrate Judge's recommendations and thus denied the motion to suppress.

On appeal of the denial of a motion to suppress evidence, we review the court's factual findings for clear error and its conclusions of law de novo. United States v. Ramires, 307 F.3d 713, 715 (8th Cir. 2002), cert. denied, No. 02-9605, 2003 WL 1609399 (U.S. Apr. 28, 2003). We must affirm the district court's ruling unless it is unsupported by substantial evidence or reflects an erroneous view of the law, or unless the record as a whole leaves us with the definite and firm conviction that a mistake has been made. Id.

I.

Corona first contends that the district court erred in finding that Munoz consented to the interception of her telephone conversation with Carlos Gaytan and Emilio Corona. Corona challenges the district court's finding of consent in fact, rather than raising the related question of whether such consent was voluntary.

Title I of the Electronic Communications Privacy Act of 1986, Pub. L. No. 99-508, Title I, 100 Stat. 1851,[4] regulates the interception of wire, oral and electronic communications. 18 U.S.C. § 2510-22 (2000). Title I provides that it is not unlawful to intercept such a communication if a party to the communication has given prior consent to the interception. 18 U.S.C. § 2511(2)(c) (2000). Nor does such an interception violate the Fourth Amendment. United States v. White, 401 U.S. 745, 753 (1971). The government bears the burden of proving consent. United States v. Gomez, 900 F.2d 43, 44 (5th Cir. 1990). Generally, we review a district court's determination that a person expressed consent under the clearly erroneous standard. United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001) (consent to search of defendant's person); see also Griggs-Ryan v. Smith, 904 F.2d 112, 118 (1st Cir. 1990) (treating consent under § 2511(2)(d) as legal issue where facts undisputed).

Consent may be express or implied, but in either case, there must be actual consent. Deal v. Spears, 980 F.2d 1153, 1157 (8th Cir. 1992). When someone voluntarily participates in a telephone conversation knowing that the call is being intercepted, this conduct supports a finding of implied consent to the interception. For instance, in United States v. Horr, 963 F.2d 1124, 1125 (8th Cir. 1992), a prison inmate used the prison telephone to plan an escape with actual knowledge that the Bureau of Prisons monitored and taped inmate calls. The inmate argued that whether

[4]Title I amended Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 212.

or not he knew of the monitoring, he had not consented to it. Even though the district court had upheld the interception on a different theory, we held that knowledge of the monitoring plus the voluntary use of the telephone proved consent under section 2511(2)(c): "Horr was aware of the telephone monitoring policy. It was his choice to use the telephone to conduct his illegal business. Having gambled by discussing his escape on the prison telephone, Horr cannot now be heard to complain that he lost." Id. at 1126. Accord United States v. O'Connell, 841 F.2d 1408, 1422 n.8 (8th Cir. 1988); United States v. Diaz, 685 F.2d 252, 254-55 (8th Cir. 1982); Griggs-Ryan, 904 F.2d at 116. Cf. Deal, 980 F.2d at 1157 (holding as matter of law that consent could not be inferred where interceptors told the party to the conversation that they might monitor the phone, but not that they were in fact doing so).

The Magistrate Judge inferred Munoz' consent to the telephone interception from her consent to cooperate in the controlled delivery and her participation in the elaborate preparations for that delivery, such as allowing herself to be wired for sound, giving the officers the keys to the Excursion, and consenting to the installation of videotaping equipment in the hotel room, all of which happened roughly contemporaneously with the telephone interception. This finding was bolstered by the trial testimony[5] of the case agent, David Rodriguez, who testified about how Munoz' cell phone conversation was recorded: "[W]e had a little, mechanical attachment that attaches to the recorder, which an individual can place the other end into their–the ear and which will pick up the recording. . . ." If Munoz was required to place a mechanical device into her ear in order to record the conversation, there can be little doubt that she was aware the conversation was being intercepted. Munoz herself testified that the police were with her when she made the call. Furthermore, Rodriguez indicated that he and Munoz listened to the tape after the call was over:

_____

[5]This court considers the entire record, including trial testimony, in reviewing denial of a motion to suppress. United States v. Blom, 242 F.3d 799, 807 n. 4 (8th Cir. 2001), cert. denied, 534 U.S. 880 (2001).

Q: And did you hear the call as it was being made?
A: I heard one side. I heard Maria's side of it.
Q: And when you–the call was over, did you listen to the recording?
A: Yes, sir, we did.
Q: And did it reflect what you had heard?
A: Yes, sir.
Q: And was there an indication from Maria that that was what took place?
A: Yes, sir. . . .

Rodriguez would hardly have played the tape back for Munoz if he had taped it without her knowledge.

The evidence that Munoz placed the call with knowledge that it was being intercepted distinguishes this case from United States v. Gomez, 900 F.2d 43, 44 (5th Cir. 1990), on which Corona relies. In Gomez there was no evidence of consent. Id.

We cannot say that the district court clearly erred in accepting the Magistrate Judge's recommendation of a finding of consent or in denying the motion to suppress the audiotape.

II.

Corona contends that the videotaping of the meeting in the hotel room violated his rights under Title I of the Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2510-22 (amending and retitling Title III of the Omnibus Crime Control and Safe Streets Act of 1968), and the Fourth Amendment.

The Magistrate Judge reasoned that silent video surveillance is not regulated or prohibited by Title I. This conclusion is supported by our opinion in United States

v. Falls, 34 F.3d 674, 678-80 (8th Cir. 1994), in which we held that a district court can issue an order authorizing video surveillance. Our own analysis of Title I discerned no congressional intent to regulate video surveillance, and we also relied on the analysis of other circuits who concluded that Title I neither regulates nor prohibits silent video surveillance. Id.

Corona points out that the videotape was not silent, but included an audio recording. The Magistrate Judge may have been confused by Corona's concession that the audio recording from Munoz' body wire was admissible. The audiotape from the body wire and the audio component of the videotape were separate recordings. In any case, Munoz expressly consented to the videotaping of the hotel meeting. Therefore, the government's audio recording of the conversation was permissible under section 2511(2)(c), under the authorities discussed in Part I.

As to the video component of the tape, the Magistrate Judge recognized that video surveillance is subject to the Fourth Amendment. See Falls, 34 F.3d at 678 (video surveillance is regulated by the requirements of the Fourth Amendment). The Fourth Amendment does not protect people from observation in places where they have no reasonable expectation of privacy. Minnesota v. Carter, 525 U.S. 83, 88-91 (1998). In Carter, a policeman peeked through the blinds in a ground-floor window of a house where Carter and Johns were bagging cocaine. Carter and Johns did not live in the house, but had only come there for two and a half hours, to bag up the cocaine. Id. at 86. The policeman peering through the window did not intrude on the Fourth Amendment rights of Carter and Johns, who had no connection with the house except for their fleeting presence there for the purpose of conducting business. Id. at 91. The Supreme Court held that Carter and Johns had no expectation of privacy in the house, because they were neither residents nor overnight guests at the house and because they were there for a commercial, not a social purpose. It was therefore not necessary to decide whether the police officer's peeking through the window was a search. Under the rule of Carter, Corona had no expectation of privacy in Munoz'

hotel room, where he was present for five minutes in connection with a commercial transaction with a stranger.[6] See United States v. Sturgis, 238 F.3d 956, 958-59 (8th Cir. 2001) (no reasonable expectation of privacy where police searched hotel room rented by someone other than defendant, which defendant visited for commercial purpose).

Corona argues that surreptitious video surveillance is more intrusive than direct observation and therefore it is reasonable to expect not to be videotaped even in places where there is no reasonable expectation of privacy from mere observation. The Ninth Circuit developed such a line of reasoning in United States v. Nerber, 222 F.3d 597, 600-05 (9th Cir. 2000). Nerber held that the defendants were justified in having an expectation not to be subject to video surveillance when left alone (with co-defendants) in someone else's hotel room, although they were there for a commercial rather than social purpose. But cf. United States v. Jackson, 213 F.3d 1269, 1280 (10th Cir.) ("The use of video equipment and cameras to record activity visible to the naked eye does not ordinarily violate the Fourth Amendment."), vacated on other grounds, 531 U.S. 1033 (2000); United States v. McIver, 186 F.3d 1119, 1125 (9th Cir. 1999) ("We reject the notion that the visual observation of the site became unconstitutional merely because law enforcement chose to use a more cost-effective 'mechanical eye' to continue to the surveillance."). Judge Gould dissented in Nerber, viewing the case as "clearly, fairly and inescapably controlled by Minnesota v. Carter," 222 F.3d at 606. In his opinion, "Those who would hatch illicit

---

[6]Corona argues that there is no evidence that he came to the room for a commercial purpose. In fact, there is plenty of evidence, including the testimony of Gaytan that he and Corona were awaiting Munoz' arrival in Minnesota with knowledge that she was bringing drugs and that Corona was supposed to make $5000 from the sale of the drugs. Even without Gaytan's testimony, the meeting itself was patently a business meeting at which Gaytan and Munoz exchanged money for the keys to a car. Munoz and Corona had no previous relationship.

plots to traffic in drugs while brandishing firepower should rent their own rooms." Id. at 607.

We need not decide whether Nerber's reasoning is consistent with Minnesota v. Carter, because the facts of this case would not justify suppression of the tape even under Nerber. Corona was not videotaped while alone (or alone with a co-defendant) in the hotel room, but only while meeting with Munoz, who had consented to the taping.

It is well-established in Fourth Amendment jurisprudence that a person engaged in a conversation assumes the risk that another party to the conversation might choose to divulge or even record the conversation. See United States v. White, 401 U.S. 745, 752-53 (1971). The Sixth Circuit recently held that the FBI did not violate defendants' rights by videotaping them at a meeting in the hotel room of an informant who had consented to the videotaping. United States v. Yang, 281 F.3d 534, 548 (6th Cir. 2002), cert. denied, 123 S. Ct. 1015 (2003). Yang analogized videotaping a meeting to audiotaping a conversation, in which the informant's consent is all that is necessary to render the taping permissible. Accord United States v. McKneely, 69 F.3d 1067, 1073-74 (10th Cir. 1995); United States v. Laetividal-Gonzalez, 939 F.2d 1455, 1461 (11th Cir. 1991), overruled on other grounds, United States v. Giltner, 972 F.2d 1563, 1565 (11th Cir. 1992); United States v. Myers, 692 F.2d 823, 859 (2d Cir. 1982).

Nerber relied on this principle to hold that the presence of an informer who had consented to video surveillance so diminished the expectation of privacy that video surveillance would not be inconsistent with reasonable expectations. 222 F.3d at 604. Nerber therefore denied the motion to suppress the videotape taken while the informer was in the hotel room, even though the court suppressed videotape taken while the defendants were alone. By the same token, Munoz' presence and consent

-10-

to the surveillance rendered it unreasonable for Corona to expect privacy with regard to their meeting.

This case does not require us to decide whether there is perfect parity between audiotaping a conversation and videotaping a meeting. Cf. United States v. Torres, 751 F.2d 875, 878 (7th Cir. 1984) ("It is true that secretly televising people (or taking still or moving pictures of them) while they are in what they think is a private place is an even greater intrusion on privacy than secretly recording their conversations."). Videotaping a person in his home, even while engaged in a conversation with an informer, could invade the privacy of the home in a way that audiotaping the same conversation would not. But this case has nothing to do with anyone's home. Here, Corona entered a stranger's hotel room for a five-minute meeting to conduct a business deal, which the stranger had consented to having videotaped. Not only did he lack an expectation of privacy in the place, but he also lacked an expectation of privacy in the meeting itself. Both the rule of Minnesota v. Carter and the rule of United States v. White show he had no reasonable expectation of privacy in this situation, and his case presents no facts that would cast doubt on the applicability of either rule.

Corona further argues that we should adopt by analogy the guidance of Title I in determining the parameters of permissible videotaping. See Falls, 34 F.3d at 680 (while Eighth Circuit does not adopt "every technical requirement of Title I" in the video surveillance context, we look to Title I "for guidance in implementing the Fourth Amendment with regard to silent video surveillance.") Section 2511(2)(c) of Title I allows warrantless interception of a communication with prior consent of a party to the conversation; analogizing to that section would lead us to conclude that videotaping a meeting with an informer who has consented to videotaping is permissible even without a warrant. Therefore, analogy to Title I would not compel suppression of the video.

We hold that the videotaping of the meeting in the hotel room did not intrude upon Corona's Fourth Amendment rights and the district court correctly denied his motion to suppress the videotape.

The conviction is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.