SUPERIOR COURT 
 
 COMMONWEALTH vs. RICHARD COMENZO

 
 Docket:
 1482CR01050 / 1782CR00150
 
 
 Dates:
 January 11, 2021
 
 
 Present:
 Robert C. Cosgrove Justice of the Superior Court
 
 
 County:
 NORFOLK, ss.
 

 
 Keywords:
 Memorandum of Decision and Order on “Defendant’s Motion to Suppress Evidence Obtained in the Warrantless Search of His Residence and [Resultant] Statements”
 
 

             Norfolk County Grand Juries have indicted the defendant, Richard Comenzo, on two counts of illegal possession of child pornography and one count of distributing child pornography.  The matter came before the court on the “Defendant’s Motion to Suppress Evidence Obtained in the Warrantless Search of His Residence and [Resultant] Statements.” Contrary to the title of the defendant’s motion, the search of his residence was hardly “warrantless.”  Indeed, this court has previously adjudicated a motion in which the defendant had moved to suppress “any and all items seized as a result of search warrants numbered 1455-SW-111, 145-SW-83, and 1855-SW-60.”  The defendant now contends, however, that crucial to the affidavit supporting probable cause to issue 145-SW-83 (Ex. 12), authorizing search of the defendant’s residence was information received by means of a prior improper warrantless search, i.e., visual recordings made by a camera surreptitiously mounted across his street on a utility pole, (hereafter referred to as a “pole camera”) and trained on the defendant’s house and areas immediately adjacent to it.  See Ex. 12, 145-SW-83, issued October 6, 2014.    The court held an evidentiary hearing on the defendant’s motion on February 28, 2020, and heard oral argument on the motion on March 3, 2020.   Following the decision of the Supreme Judicial Court (SJC) in Commonwealth v. Mora, 485 Mass. 360 (2020), this court received supplemental memoranda from the parties.   In consideration of its resultant findings of facts, and the submissions and arguments of the parties, the court now denies the defendant’s motion.
Findings of Fact
            From 2012-2018 Det. Lt. Denise Doherty was assigned to the Norfolk County District Attorney’s Detective Unit, specifically tasked to investigate crimes against children.  Her duties and expertise included forensically examining electronic devices, in furtherance of which she was certified in various software extraction programs.
            In May and June of 2013, Doherty began investigating a report received from the National Center for Missing and Exploited Children (NCMEC) that its cyber tip line had received reports concerning images posted on a Tumblr blog “bostonslavedad3.”  Tumblr is an internet social networking service.  Doherty examined thirteen images from the bostonslavedad3 blog which NCMEC had supplied, and concluded that two of them constituted child pornography under Massachusetts law.  Doherty had been given an internet protocol address associated with the blog, which traced back to Verizon.  Via administrative subpoena, she learned that the subscriber was the defendant, Richard Comenzo, with an associated address of 15 Walnut Avenue, Stoughton.  Doherty checked Comenzo’s driver’s license and car registration records at the Registry of Motor Vehicles (RMV), and found that both were associated with a different address, 719 Washington Street in Stoughton.  This was a business address; his RMV residential address was left blank.  Doherty also ran a Lexis/Nexis search relative to the defendant.  She was or became aware that Comenzo is an attorney, and also the president of a company.  She learned that years ago, Comenzo had maintained a law office at 15 Walnut Avenue, but its telephone number was listed by Verizon as defunct.
            Doherty and associated troopers initiated a conventional surveillance of 15 Walnut Avenue, sometimes on foot, sometimes in a vehicle.  She observed the property on about six occasions between August and September, 2014.  In addition, Trooper Sean Quirk went to the property on about three occasions, sometimes accompanied by another trooper.
            Doherty observed that the building at 15 Walnut Avenue is a multi-family dwelling with three levels, located in a mixed residential and commercial neighborhood next to Arch Orthodontics at 5 Walnut Avenue.  The front of the building faces a park.  As Doherty looked at the building from across Walnut Avenue, she had an unobstructed view and could see that the building had an open, paved parking lot to the left side; to the right was a front lawn, simply grass.  There is a front porch.  Later, pursuant to a warrant, Doherty entered the building on October 7, 2014, and observed that after walking up the front porch and entering through the front door, one enters a foyer.  At the top of its stairs is the front door to the defendant’s apartment.
            Walnut Avenue forms one leg of a triangle with two intersecting streets, Walnut Street, and Park Street, which is also Rt. 27.  The Stoughton Public Library sits on Park Street within distant view of 15 Walnut Avenue, adjacent to the park.  
            During her conventional surveillance of 15 Walnut Avenue, Doherty observed the front door of the building, and saw the defendant coming and going in his car, and entering and leaving the building.  She took note of lights going on and off in various sections of the building, and the relationship between the operation of the lights and the defendant’s arrival and departure, and that of one of his apparent guests.  
            There were mailboxes in front of the building, but the U.S. post office did not deliver any mail to the defendant there.  The defendant’s name was not on any mailbox.  Apartment 2’s mailbox had the name “J. Parento,” and Apt. 3’s, “Hill/Cohen.”  There were eight utility meters in the driveway.  On August 12, 2014, Sgt. Keith Pantazelous accompanied by Sean Quirk, went to 15 Walnut Avenue.  They spoke to a resident in the building, John Finney, who admitted them to a common area in the rear of the building and said there were five apartments in the back of the building, three in the front.  
            On September 18, 2014, Doherty requested the installation of a pole camera to surveil 15 Walnut Avenue; typically, such a request goes through the District Attorney’s office.  Doherty asked for the pole camera in part because surveillance otherwise had to be conducted in a very open area, thereby risking detection by the target.  On September 19, 2014, the Special Services Unit of the State Police installed the pole camera, a video camera that does not record sound, on a utility pole across the street from 15 Walnut Avenue.  On January 9, 2020, Pat Mason, a private detective retained by the defendant, visited 15 Walnut Avenue and took measurements.  The distance from its front door to the pole camera utility pole is eighty-two feet, five inches.  From the left side of the building to the utility pole is ninety-four feet, four inches. 
            A problem developed with the pole camera; it was not functioning between 6:07 p.m. September 26, 2014 and September 30, 2014 at 4:48 p.m., at which time, having been serviced, it resumed function.  
            On October 6, 2014, a justice of this court (Dennis J. Curran, J.) issued a search warrant, 145-SW-83 (Ex. 12).  Lt. Doherty’s affidavit in support of the search warrant application incorporated photographs of the defendant’s residence, but none of them were taken with the pole camera, and the affidavit, in fact, made no mention of the pole camera surveillance.
            On October 7, 2014, the defendant’s residence at 15 Walnut Avenue was searched pursuant to that warrant and the defendant was arrested and questioned by Lt. Doherty in a recorded interview.  Among many other things, the warrant authorized seizure of any keys on the defendant’s person “that provide access to rooms, spaces or containers at 15 Walnut Avenue.”   The defendant had such a key or keys when the warranted was executed and he was arrested.  
            The pole camera continued to function through October 9 and October 10.[1]  Those additional two days were not the product of any investigative purpose; rather, they were the result of how long it took the Special Services unit to find the time to take down the camera.
            Once affixed, a pole camera enables the police to monitor a specific location.  One can monitor the camera feed remotely in real time.  The camera can and does record, with the recording ultimately to be downloaded to a server, in this case, located in the Norfolk District Attorney’s office in Canton.  During live viewing, a monitor--in this case it was Sean Quirk--can cause the camera to zoom in or zoom out.  He can also rotate the camera up to about 45 degrees, left, right, up, and down.  Otherwise, the camera does not move; it cannot, for example, follow a car or vehicle down the street (and capture it on video) once it moves beyond the camera’s fixed range.  What is recorded is what the camera “sees” in real time; consequently, one replaying the recording is limited to that view and cannot pan, zoom, or rotate to change the view.  The camera has no special capabilities of a “sense enhancing” nature; for example, it has no infrared or “night vision” function.  The evidence before the court did not include the model or manufacturer of the camera, and neither does the court have evidence as to the camera’s particular lens.
            The placement of the camera on the utility pole across the street from 15 Walnut Avenue allowed a clear view of the left side of the residence, including its front door.  During daylight hours, or when there was sufficient illumination, the camera captured people approaching, entering, and exiting the front door with sufficient clarity to identify them and discern what they were wearing, what they might be holding in their hands, or doing.  (Exhibits 9-10; 13-35, 40-48; compare ex. 68-72).   The camera also had a clear view of the driveway on the left side of the house.  Its view could enable an officer to identify vehicles parked in the driveway, see residents and guests entering and leaving, and observe what they might have in their hands or place or remove from a vehicle, at least during the day; screen shots from the pole camera suggest that doing so would be difficult during the night, although some inferences might be drawn by noting the positions of the cars in the driveway during the daytime.  (Ex. 49-62, 76-78).  As the pole camera footage is time-stamped, an officer can place observations at a particular time.  
            The pole camera has been described as able to create a digitally searchable log, and this is true; however, the log enables search by date and time.[2]  So if, for example, an officer notes that a party enters the locus at 7:00 a.m. on one morning, it is possible to go to 7:00 a.m. on different dates and observe whether the same party enters or does not enter at about that time.  However, the log is not configurable; it is not possible to search it by person, vehicle, license plate, motion, or anything other than date and time.   Testifying at the evidentiary hearing, Sgt. Pantezelous asserted that nothing was seen via the pole camera that could not have been observed by someone who was physically present; based on its review of the exhibits and its sampling of the video footage, the court agrees.
            There is no standard operating procedure or written state police policy as to pole cameras, and thus, no limitation as to the number of hours that may be recorded at a particular location, or how long the camera is up, or how long the footage from the camera must be kept, although it is typically kept until the adjudication of the related case.  Footage is assigned a case number for record keeping purposes.  Officers assigned to the case may access the camera remotely while it is up. 
Discussion and Rulings of Law
I.  The Posture of the Case, Pre-Mora
            The defendant argued that the pole camera was essential to establishing probable cause for the subsequently issued warrants, because its use provided crucial evidence that he resided on the second-floor in areas 1-3, without which the search warrants and affidavits would have lacked sufficient particularity.  He argued that evidence must be suppressed because pole camera surveillance constituted a search under the Fourth Amendment of the United States Constitution and Article 14 of the state constitution, and thus required a warrant, which the Commonwealth had failed to obtain.  
            To these contentions, the Commonwealth responded that there was no search within the meaning of the Fourth Amendment or Article 14, and even if this court were to find to the contrary, if one excises the pole camera information from the warrants’ affidavits, sufficient probable cause remained to justify the search.  
            Probably to forestall any response by the Commonwealth that the defendant has waived his arguments by failing to raise them in his earlier motion to suppress considered by Judge Fishman in September of 2015, the defendant filed an affidavit from his former counsel, Andrew Cowan.  Cowan averred that at the time he filed the earlier motion, he knew of the pole camera surveillance but thought he lacked a good faith basis to assert that its use was unconstitutional, believing that the issue was governed by the “long-established Constitutional doctrine that a suspect does not have a reasonable expectation of privacy in his public movements.”  It did not occur to him that the fruits of the pole camera video might be suppressed until he read a Massachusetts Lawyers Weekly report of Judge William Young’s decision in United States v. Moore-Bush, 381 F. Supp. 3d 139 (D. Mass. 2019), which held that pole camera surveillance of a particular suspect’s home violated the Fourth Amendment.[3]  
             For some years, the law of search and seizure primarily looked to whether there was a physical trespass by government agents into a constitutionally protected area.  See Florida v. Jardines, 569 U.S. 1, 5 (2013); United States v. Jones, 565 U.S. 400, 406 n.3 (2012).  After Justice Harlan’s influential concurring opinion in Katz v. United States, 389 U.S. 347 (1967), modern search and seizure law, without abandoning the earlier line of opinions, see Jones at 406, now focuses primarily on protecting reasonable expectations of privacy.  Thus, “[a] ‘search’” implicating the Fourth Amendment “occurs ‘when an expectation of privacy that society is prepared to consider reasonable is infringed’ . . . [and a] ‘seizure’ of property” for purposes of the Fourth Amendment “occurs when ‘there is some meaningful interference with an individual’s possessory interests in that property.’”  United States v. Karo, 468 U.S. 705, 712 (1984), quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984).   
            Although the Commonwealth has the burden of establishing that a warrantless search is lawful, under both the Fourth Amendment and Article 14, the defendant has the initial burden of establishing that a search has taken place.  Commonwealth v. D’Onofrio, 396 Mass. 711, 714-715 (1986); Commonwealth v. Carter, 424 Mass. 409, 411 (1997).  To meet his burden, the defendant must show that he has a constitutionally protected reasonable expectation of privacy on which the police have intruded.  Carter, 424 Mass. at 411-412.  Differently put, “[t]he defendant bears the burden of proving that he had [both] a subjective and objectively reasonable expectation of privacy.”  Commonwealth v. Mamacos, 409 Mass. 635, 638 (1991), citing Rawlings v. Kentucky, 448 U.S. 98, 104 (1980), Commonwealth v. Chappee, 397 Mass. 508, 512 (1986). 
            At the time the defendant filed and argued the motion before this court, neither the United States Supreme Court, nor the appellate courts of this Commonwealth, had considered the objective reasonableness of a defendant’s expectation of privacy in the context of police surveillance of his property by means of a pole camera.  However, a number of federal courts had done so, as had the courts of various states.   In the First Circuit, the governing federal law was United States v. Bucci, 582 F. 3d 108 (1st Cir. 2009).  There, “[l]aw enforcement authorities installed a video camera on a utility pole across the street from Bucci’s home and conducted surveillance of the front of his house for eight months.”  Id. at 116.  The court held that “[a]n individual does not have an expectation of privacy in items or places that he exposes to the public.”  Id. at 117, citing Katz, 389 U.S. at 351 (“What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.”). 
            In Moore-Bush, Judge Young considered the defendants’ attempt to distinguish the controlling precedent of Bucci and ultimately agreed with them that its reasoning had been undermined by Carpenter v. United States, 138 S. Ct. 2206 (2018).  See Moore-Bush, 381 F. Supp. 3d. at 144.  Judge Young pointed to three things in Carpenter that he found significant.  First, its statement that “[a] person does not surrender all Fourth Amendment protection by venturing into the public sphere.  To the contrary, ‘what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.’” Id. at 144-145, quoting Carpenter, 138 S. Ct. at 2217 (quoting Katz, 389 U.S. at 351-352).[4]  Second, its recognition that “long-term tracking of a person’s movements ‘provides an intimate window into a person’s life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations.’”  Moore-Bush, 381 F. Supp. 3d. at 145, quoting Carpenter, 138 S. Ct. at 2217 (quotation and citation omitted).  Third, “the Supreme Court distinguished the tracking involved in Carpenter from historical surveillance methods . . . [in] that the tracking produced a log that law enforcement officers could use to ‘travel back in time to retrace a person’s whereabouts’ whereas ‘a dearth of records and the frailties of recollection’ limited surveillance in the past.’”  Id., quoting Carpenter, 138 S. Ct. at 2218. 
            Having found in Carpenter a wedge to escape the hitherto controlling precedent of Bucci, Judge Young analyzed the facts before him and found the use of the pole camera in Moore-Bush to be constitutionally repugnant.  The judge “infer[red] from [the defendants’] choice of neighborhood that they subjectively expected that their and their houseguests’ comings and goings over the course of eight months would not be surreptitiously surveilled.”  Moore-Bush, 381 F. Supp. 3d. at 143.  Second, the judge concluded that this expectation was objectively reasonable.  Id.  Finally, he ruled that the particular use of the pole camera at issue was a search.  Id. at 150.  Not every use of a pole camera was necessarily a search, but in the case before him, various aspects of the government’s use led to the conclusion that the defendants had been searched.  Those aspects were:  “(1) continuous video recording for approximately eight months; (2) focus on the driveway and front of the house; (3) ability to zoom in so close that it can read license plate numbers; and (4) creation of a digitally searchable log.  Taken together, these features permit the Government to piece together intimate details of a suspect’s life.”  Id. 
            Understandably, the defendant relied heavily on Moore-Bush, both as persuasive authority and as a source for his own arguments.  One Superior Court pole camera case had considered and rejected Moore-Bush’s reasoning, Commonwealth v. Mora, et al, ESCR2018-00540 (Mass. Super. Nov. 4, 2019) (Feeley, J.).  Judge Feeley held that Carpenter “did not change the well-established case law rejecting challenges to pole camera surveillance . . . .”  Id. at *16, citing Bucci, 582 F.3d at 116-117.    At the time the present motion was heard, Judge Feeley’s decision was under review by the SJC, and Moore-Bush by the First Circuit Court of Appeals. 
            Judge Young’s analysis in Moore-Bush won no plaudits from those federal courts to which it was cited.  See United States v. Edmonds, 438 F. Supp. 3d 689, 693 (S.D.W. Va. 2020) (“The court does not find the analysis in United States v. Moore-Bush to be persuasive.”);  United States v. Tuggle, 2019 WL 3915998, at *2 (C.D. Ill. Aug. 19, 2019) (Moore-Bush ruling does nothing to alter the Court’s earlier reasoning and conclusion that pole camera surveillance of the defendant’s home was not a Fourth Amendment search).  Neither was Judge Young’s decision favorably reviewed by the First Circuit, which reversed it.  See United States v. Moore-Bush, 963 F.3d 29, 47 (1st Cir. 2020) (nothing in the United States Supreme Court’s opinion in Carpenter v. United States provided any basis for the district court to depart from controlling precedent in Bucci).[5] 
            Judge Young’s conclusions, if not the entirety of his reasoning, however, fell on more receptive ears at the Massachusetts Supreme Judicial Court, which reversed Judge Feeley’s decision in Mora on state constitutional grounds.  Commonwealth v. Mora, 485 Mass. 360 (2020).
II. The posture of the case post-Mora
            The Supreme Judicial Court’s decision in Commonwealth v. Mora now controls, and simplifies, this court’s inquiry.   The SJC declined to opine on whether the use of a pole camera was a search under the Fourth Amendment, instead considering the issue under art. 14 of the state constitution.  The court concluded that in the cases before it, the targeted pole camera surveillance of the codefendants’ homes of over a two month duration was indeed a “search” under art. 14, requiring a warrant.  Id. at 376.  Recognizing that prior to its decision, police departments had used pole cameras without obtaining warrants, the SJC did not order the evidence in Mora suppressed, but remanded the case to the Superior Court, instructing the judge to consider “whether, at the time the pole camera surveillance began, the Commonwealth had probable cause to believe that a particularly described offense has been, is being, or is about to be committed, and that [pole camera footage sought] w[ould] produce evidence of such offense or w[ould] aid in the apprehension of a person who the applicant ha[d] probable cause to believe h[ad] committed, [wa]s committing, or [wa]s about to commit such offense.”  Id. at 376-377 (quotation and citation omitted).
            In the present case, the warrantless pole camera was deployed prior to Mora, and it follows that if a warrant was required here, this court should undertake the same analysis.[6]
            Was a warrant necessary under a Mora analysis?  
A.  Duration and Locus of Surveillance
            Mora did not hold that every use of pole camera by law enforcement requires a warrant.  Rather, the SJC was careful to note that “[a] briefer period of pole camera use, or one that is not targeted at a home, might not implicate the same reasonable expectation of privacy,” id. at 375-376, (emphasis supplied), and it follows that in such circumstances, a warrant would be unnecessary.  It is the “combination of duration and [the] aggregation” of extensive data tending to expose “otherwise unknowable details of a person’s life” in targeted surveillance that “implicates a person’s reasonable expectation of privacy.”[7] Id. at 373.
            The defendant emphasizes that the camera here was indeed targeted on his home, and stresses Mora’s reiteration of long-standing constitutional doctrine that a person’s right “to be free from unreasonable governmental intrusion” is at the heart of the Fourth Amendment’s protections.  485 Mass. at 371.[8]   In Moore-Bush, Judge Young had “infer[red] from [the defendants’] choice of neighborhood that they subjectively expected that their and their houseguests’ comings and goings over the course of eight months would not be surreptitiously surveilled.”  381 F.Supp.3d at 143.  Unlike the defendants in Moore-Bush, Comenzo did not manifest an expectation of privacy by “choosing to live in a quiet, residential neighborhood in a house obstructed by a large tree.”  Id.  Rather, he chose a multi-unit apartment building in a mixed commercial and residential neighborhood, opposite a public park on a street intersecting nearby with a major traffic route, Rt. 27.[9]  Mora, however, appears to have adopted a very low bar for a defendant to meet his burden of establishing a subjective expectation of privacy.  Other courts have looked to specific measures taken by the defendant to shield his dwelling from observation. See, e.g., Bucci, 582 F.3d at 116-117 (1st Cir. 2009) (noting that there were no fences, gates, or shrubbery obstructing the view from the street).  The SJC, however, has reasoned that “requiring defendants to erect physical barriers around their residences before invoking the protections of the Fourth Amendment and art. 14 would make those protections too dependent on the defendants’ resources.”  Mora, 485 Mass. at 367. The SJC held that in light of the months of surveillance, filing affidavits asserting that the defendants “did not expect to be surveilled coming and going from their homes over an extended period” was sufficient to manifest a subjective expectation of privacy.  Id. at 366.  Although the Commonwealth’s initial filings vigorously contested whether the defendant had established a subjective expectation of privacy, its post-Mora memorandum makes no mention of the issue.  The court concludes that this is a proper bow to the reality of the changed judicial landscape.
            In contrast, the Commonwealth argues that its relatively brief use of the pole camera—a little over two weeks, rather than the two or more months in Mora—was not a search requiring a warrant.  In suggesting that “[a] briefer period of pole camera use . . . might not implicate the same reasonable expectation of privacy,” id. at 375-376, (emphasis supplied), the SJC found it unnecessary to “decide in t[he Mora] case where t[he] boundary lies.”  Id. at 376.  The question is open for this court, at least initially.  
            Preliminarily, the court must decide what period of time should govern its analysis:  the ten days of pole camera observations used by Lt. Doherty in devising her affidavit for a search of the defendant’s residence, the total of fifteen days before the investigating officers executed the search of the defendant’s residence, or the entire seventeen days the pole camera was operative, including the two days following the search where the camera kept recording simply because it took special services a few days to schedule and accomplish the camera’s removal?  Because the remedy sought is suppression of the evidence resulting from a search pursuant to a warrant, there is a strong argument for limiting the time period to that relied on by Lt. Doherty in composing the affidavit in support of the warrant.  However, this court holds that the appropriate unit of measurement is the entire time that the pole camera was running, which is the duration of the privacy intrusion, i.e., seventeen days.
            The next question is at what point one might reasonably expect a pole camera with the capabilities of the one employed here trained on a home to generate enough data to compose a sufficiently detailed “mosaic” to discern a picture of the target’s “associations, proclivities, and more,” thus generating the need for a warrant.  Mora, 485 Mass. at 375 (internal quotation marks and citations omitted).  Obviously, the longer the pole camera is operative the more details that will be captured, and the more likely that an accurate picture can be painted, and that activities and associations that are idiosyncratic or departures from normal routine can be placed in proper perspective.  One might expect a few days of recordings, or even a week’s worth, not to require a warrant; it is not unreasonable to think that such observations could well be likely duplicated by conventional surveillance without unduly taxing police resources.  Moreover, a week’s observations may well be atypical, departures from a suspect’s normal routine.  That is less likely to be true if the recordings extend to a second week.  One week may be compared to another, and inferences drawn as to usual activities and associations.  Of course, that is even more the case with a month’s worth of observations.  Any number is ultimately arbitrary, but it seems to this judge that two weeks is the reasonable point to draw the line, in light of the SJC’s policy concerns.[10]  It follows that the seventeen-day video surveillance in this case would have required a warrant under Mora.  Accordingly, the court now considers whether probable cause for a warrant existed at the time pole camera surveillance began.
B.  Probable Cause 
            I need not tarry long in considering whether there was “probable cause to believe that a particularly described offense ha[d] been, [wa]s being, or [wa]s about to be committed.”  Mora, at 377. As the Commonwealth summarizes, “[p]olice knew that child pornography was uploaded from 15 Walnut Avenue . . . [and] that the IP address used to . . . [do so] was paid for by the defendant at 15 Walnut Avenue.  Police had observed the defendant parking his car and exiting the front door at 15 Walnut Avenue on multiple occasions.”  Moreover, Judge Fishman necessarily found there was probable cause in denying the defendant’s earlier motions to suppress the fruits of the search warrants.  Judge Fishman’s finding, with which I in any case independently concur, represent the law of the case. 
            The remaining question under Mora is whether the “[pole camera footage sought] w[ould] produce evidence of such offense or w[ould] aid in the apprehension of a person who the applicant ha[d] probable cause to believe h[ad] committed, [wa]s committing, or [wa]s about to commit such offense.”  Id. at 376-377 (emphasis supplied).  The Commonwealth argues, correctly, that “[b]ecause there was conflicting information as to which apartment number was the defendant’s, investigators knew that the pole camera would produce evidence of the exact part of 15 Walnut Avenue that was his residence.”  The defendant necessarily must concede that the Commonwealth is correct, as the entire point of his motion, as originally filed, is that without the pole camera observations, the Commonwealth would have been unable to satisfy the particularity requirement necessary for a search warrant of the defendant’s residence.  As the defendant puts it in his September 17 memorandum, “[w]ithout the aid of the pole camera evidence, Doherty could not satisfy the particularity requirement, which is why she installed the pole camera.” 
Summary
            Pole camera surveillance of the defendant’s home for seventeen days constituted a search under art. 4, which, post-Mora, would have required a warrant.  Because the surveillance took place pre-Mora, the court looks to whether, at the time of the surveillance, the Commonwealth had probable cause to believe that a crime had taken place and that use of the pole camera would provide evidence of the crime or aid in the apprehension of the person who committed that crime.  The Commonwealth satisfies those tests.
            In light of the court’s conclusions, it is not necessary to reach the Commonwealth’s argument that there was probable cause for the search warrants even if the information gleaned from the pole camera search were to be excised from the supporting affidavits.  Neither is it necessary to consider the Commonwealth’s argument that the seizure of the keys from the defendant’s person would have inevitably led the troopers to the correct apartments to search.
Order
            After hearing, the defendant’s motion is denied.
@/s/Robert C. Cosgrove Justice of the Superior Court
@January 11, 2021
footnotes

[1] Effectively, then, the camera was functioning for seventeen days including October 7, the day the defendant’s apartment was searched, plus two additional days thereafter.  In her affidavit in support of the search warrant, Doherty relied on ten days’ observations.
[2] The search window is visible on all of the screen shots introduced as evidence.  In addition, the court has itself reviewed the surveillance video, introduced as exhibit 90, although its review consisted of a sampling, rather than viewing the entire, multi-week surveillance.
[3] At least one case published by the time Attorney Cowan filed his motion had held that “law enforcement’s video surveillance of [a defendant’s] front yard for six weeks with a camera that could zoom and record violated his reasonable expectation of privacy . . . .”  United States v. Vargas, 2014 U.S. Dist. LEXIS  184672, at *26 (E.D. Wash. Dec. 15, 2014).  See also United States v. Cuevas-Sanchez, 821 F.2d 248, 251 (5th Cir. 1987) (continuous silent videotape surveillance of an enclosed private area must be judicially authorized); United States v. Koyomejian, 970 F. 2d 536, 542 (9th Cir. 1992) (same); United States v. Falls, 34 F.3d 674, 678 (8th Cir. 1994) (same); Shafer v. City of Boulder, 896 F. Supp. 2d 915, 930-932 (D. Nev. 2012).  However, no U.S. Supreme Court, First Circuit, or Supreme Judicial Court decision would have alerted Attorney Cowan to the issue, and it appears that his assessment at the time was not unreasonable.  In any event, the Commonwealth did not contend that the argument was waived, and the SJC’s subsequent decision in Mora would have rendered any such contention futile.
[4] That the U.S. Supreme Court was quoting from its opinion in Katz, decided in 1967, almost half a century before the First Circuit decided Bucci, appears not to have fazed Judge Young.
[5] Judge Young’s opinion may yet be vindicated.  On December 9, 2020, the First Circuit granted en banc review, pursuant to which the panel opinion was withdrawn and its judgment vacated.  See United States v. Moore-Bush, 982 F.3d 50 (2020).  No reason was given for the court’s action, but it is a reasonable inference that the First Circuit wishes to reevaluate the principles it adhered to in Bucci.
[6] The SJC had previously held that “art. 14 provides more substantive protection to criminal defendants than does the Fourth Amendment in the determination of probable cause.”  Commonwealth v. Upton, 394 Mass. 363, 373 (1985) (“Upton II”).  Accordingly, if the art. 14 standard for a pole camera search is met, the Fourth Amendment standard—though still not the subject of decision by the United States Supreme Court--should necessarily be met as well.  The defendant has not argued that the search here at issue presents a novel departure from the Upton II doctrine, in that, in this instance, the Fourth Amendment’s protections uniquely exceed those of art. 14.  
[7] “Otherwise unknowable” must be regarded as a bit of rhetorical hyperbole, a dramatic stand-in for “otherwise unlikely to be discovered.”   The Mora court never identifies any piece of information generated by the pole camera recordings that could not have been discovered through conventional in-person surveillance, or recorded by previously approved means, such as cameras.  Rather, the argument is that (1) it is unlikely that police would dedicate the human and financial resources to engage in non-stop conventional surveillance over an extended period of time; and (2) human note taking is imperfect and memory fallible, but the continuous, searchable recording allows police to memorialize, search for, and extract details which would otherwise be lost or overlooked, and to construct a “mosaic” picture of the target’s “associations, proclivities, and more.”  Mora, 485 Mass. at 375, quoting Levinson-Waldman, Hiding in Plain Sight: A Fourth Amendment Framework for Analyzing Government Surveillance in Public,” 66 Emory L.J. 527, 603 (2017).
[8] He also argues that “the duration of the pole camera’s use need not be excessive, or for a considerable duration of time, because we are dealing with an illegal search of a home.”  (Of course, in saying that there was a “search,” the defendant presumes his desired conclusion).   Contrary to the defendant’s argument, Mora does not suggest that duration is an irrelevant or minor consideration when the pole camera at issue is focused on a home.
[9] The defendant does not argue that his choice of neighborhood manifested a subjective expectation of privacy, but relies on other factors.  He cites a number of things caught by the pole camera after it went up, suggesting that they show a subjective expectation of privacy.  For example, the defendant points out that on October 3, 2014, the pole camera records that “at 3:38 a.m., a male guest enters the front door and Comenzo’s apartment lights are turned on thereafter.”    He argues that “[given the early hour . . . when it was dark outside, it is reasonable to infer that the parties intended their meeting to be private.  Moreover, they had a reasonable expectation that others (especially the government) –would not monitor and record their private encounter.”  Another visit on September 21, 2014, is also described and similarly characterized as intrusive.  But the police were not, and could not have been aware of those things at the time the pole camera surveillance was initiated, and thus they have no relevance to whether this particular defendant manifested a subjective expectation of privacy.  While what the camera records may inform the court’s analysis of the camera’s capabilities, the subjective expectation analysis must be based on the information reasonably known or knowable to the police before the pole camera went up, not on what came to light afterwards.  This approach is standard in search and seizure law; one may have reasonable suspicion or probable cause, search, and find nothing.  The failure of the search does not retroactively vitiate reasonable suspicion or probable cause, any more that a successful search based on a mere hunch retroactively supplies probable cause.
The defendant also points out that the police knew that he was an attorney and the president of a company.  His occupational status affords him no greater constitutional protection than any other.  The attorney-client privilege protects clients’ confidential communications but does not prevent the police, or anyone else, from observing them enter or leave someone’s dwelling.  The defendant has not shown, in any event, that he used his residence rather than his nearby office to meet with clients or conduct business.  The Commonwealth has not argued that to the extent the defendant used his home for business purposes, the special protections and expectations of privacy afforded a home were thereby compromised and diminished.  Accordingly, the court does not address that issue.
[10] In Commonwealth v. Cruz-Gonzalez, a justice of this court (Karp, J.) held that pole camera surveillance of 23 days was a search requiring a warrant under Mora.  See 2020 WL 7055431, at *10 (Mass. Super. Nov. 30, 2020).  In a comprehensive and carefully written opinion, Judge Karp relied on a close reading of Mora and a number of SJC cases involving GPS surveillance.  Because the undersigned judge finds the data available from GPS surveillance, in most respects, to be potentially more expansive than that from a camera trained on the exterior of a defendant’s residence, he has taken a somewhat different route, though recognizing the force of the analogy to the GPS cases.   A pole camera does not move from its fixed location, and unlike a GPS, lacks the potential to track a person’s every movement and location throughout the day.  As Judge Feeley put it, “[i]t may identify a limited number of associates/friends, but associations not depicted at the front of the residence are unknown to law enforcement. . . Pole camera surveillance does not follow its subjects into private residences, doctor’s offices, hospitals, political headquarters, houses of worship, known drug houses, locations of unlawful drug activity or residences of known drug dealers, methadone clinics, brothels, locations of sexual liaisons, firearms businesses, and other potentially revealing locales.”  Mora, ESCR2018-00540, at *17 (Feeley, J.).